Attilio **MATTIVI**, Plaintiff-Appellant and Cross-Appellee,

v.

**SOUTH AFRICAN MARINE CORP, "HUGUENOT", Defendant-Appellee and Third-Party Plaintiff,**

v.

**INTERNATIONAL TERMINAL OPERATING CO., INC., Texaco, Inc., New Jersey Export Marine Carpenters Inc., Colgate Palmolive Company and Manhattan Oil Transport Corp., Third-Party Defendants.**

No. 73, Docket 79–7073.

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 1979.

Decided Feb. 20, 1980.

William F. Cioffi, Brooklyn, N. Y. (Irving B. Bushlow, Theodore W. Bushlow, Brooklyn, N. Y., of counsel) for plaintiff-appellant and cross-appellee.

Ralph P. Cosentino, New York City (Healey & McCaffrey, Thomas H. Healey, New York City, of counsel) for defendant-appellee and third-party plaintiff.

Before MOORE, TIMBERS and VAN GRAAFEILAND, Circuit Judges.

MOORE, Circuit Judge:

In this personal injury suit brought under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), plaintiff Attilio Mattivi (Mattivi) appeals from a judgment notwithstanding the verdict granted by the United States District Court for the Eastern District of New York, Honorable Eugene H. Nickerson, Judge, in favor of defendant South African Marine Corporation (South African).

The facts are comparatively simple. In June, 1973 Mattivi was employed as a marine carpenter by New Jersey Expert Marine Carpenters, Inc. (NJEMC). At 8:00 A.M. on June 7, 1973 Mattivi arrived for his day's work at Pier 2 of the Army Base in Brooklyn, New York, and was assigned to plank over a section of metal drums stowed along hatch number five of South African's ship, the S.A. HUGUENOT. Working with two other carpenters, by 9:30 A.M. he completed a substantial area of the planking and began to run a catwalk down the middle. At that point, their work was interrupted by three men. One of the men (who Mattivi thought was dressed in a uniform) watched the other two men raise a rubber hose up from a barge docked alongside the HUGUENOT, run it over the planking, and drop it down into the hold of hatch number five. In the act of laying the hose, these men spilled some drops of oil on the planking. In Mattivi's words: "Then when they coupled [the hose], [spilled a] couple drops of oil, then I turn to the man, the uniform man I say, 'Look, you see this', he said, 'Yes, don't worry about it, we take care of it' then I turn around and do my work." (App. 41–42). Mattivi never ascertained the identity of the three men or who their employers were.

Around 11:00 A.M. Mattivi decided to go get a fresh supply of nails. As he was walking on the planking he slipped off the platform and fell three or four feet to the metal deck below. Mattivi testified: "I went to get nails and I walk a couple of—I slip on my left foot on the oil and I drop my right foot on the hose and I fell down on my left side on the deck". (App. 44). One of the other carpenters helped Mattivi to his feet and led him to an area on the deck where he could sit down. Mattivi testified that he did not see any hose or oil as he was walking just before the fall, and that he did not know what caused him to slip. (App. 58–63, 73, 76–77). He never returned to hatch number five that day and never made a complaint to any sailors or to anyone else. He did mention the fall to his foreman, Frank Zovich, who told him to "take it easy" (Deposition of January 30, 1975, at 30–31) for the rest of the day. Mattivi did that, working at hatches number two and three handing down lumber to other carpenters until the 9:00 P.M. quitting time.

Mattivi sued South African pursuant to the recently amended LHWCA, 33 U.S.C. § 905 *et seq.*, for the personal injuries he allegedly suffered as a result of his fall. South African impleaded the Manhattan Oil Transport Corporation (Manhattan), as well as the International Terminal Operating Company, Inc., Texaco, Inc., NJEMC, and the Colgate-Palmolive Company. The trial was split, and the issue of liability was tried before Judge Nickerson and a jury on November 28 and 29, 1978. Mattivi was the

only witness at the trial and his testimony was the only proof as to liability introduced.[1] After all the evidence was presented, South African moved to dismiss. The court agreed with South African "that this is a case that simply should not go to [a] jury and that the Court should so rule" but he declined to dismiss the case before it had gone to the jury in light of this Court's disapproval of that procedure.[2] (App. 87, 82).

The jury returned with a verdict in favor of Mattivi. South African immediately renewed its motion to set the verdict aside, stating that despite the "somewhat conflicting and difficult" strand of LHWCA cases in this Circuit, it was hard to believe that "any court could find that the evidence is sufficient as a matter of law to make a finding of negligence on the part of the ship owner in this case". (Supp.App. 6). After a brief oral argument, Judge Nickerson ruled from the bench:

"I am going to grant the motion. I don't think there is any evidence from which the jury can properly infer that the defendant was negligent. I find no evidence from which they could infer in the first place that he slipped on anything. . . .

1. Frank Zovich, Mattivi's foreman, was in the courtroom but was not called by either party. (App. 22, 47).

2. There is no doubt that in most cases it is in the best interests of efficient judicial administration for the trial judge to refrain from considering a motion for a directed verdict in favor of deciding a motion for judgment n. o. v. When a motion for a directed verdict is made at the conclusion of the plaintiff's case, it is certainly within the discretion of the trial judge to grant it, but it is "the better and safer practice . . . to defer a ruling upon the motion . . . until both sides have finally rested". 9 Wright & Miller, *Federal Practice & Procedure* § 2533 at 585–86 (1971). And even when all the evidence has been concluded, it is generally considered desirable for the trial judge to refrain from directing a verdict. Appellate courts have repeatedly stated it is best for the trial judge to take a verdict, and then to pass on the sufficiency of the evidence on a post-verdict motion (*i. e.*, a motion for judgment n. o. v.). The rationale for this is aptly set forth in Wright & Miller:

"If a verdict is directed and the appellate court holds that the evidence was in fact

Secondly, I find that no credible evidence that the ship had notice of a dangerous condition. The fact there were a couple of drops, whatever the testimony here is, at the time of the coupling, certainly was not sufficient to show that a dangerous condition existed at 11 o'clock or whatever time it was.

Thirdly, . . . I find nothing in the record from which the jury might infer that even if it had notice of whatever condition was there that they could properly anticipate that someone would injure themselves on it.

And fourthly, I find, even if the three elements were proven, I find there's nothing in the record whatsoever or in the testimony to justify their inferring that someone else wouldn't clear that up who was actually engaged in that operation, whether it was the oil company or whoever it was that was operating that, which was not the ship's responsibility to put the oil in." (Supp.App. 12–13).

Judge Nickerson also granted a new trial in the alternative because he was "very disturbed" by the inconsistencies between Mattivi's testimony at his depositions and at trial and by the fact Mattivi signed his

sufficient to go to the jury, an entire new trial must be had. If, on the other hand, the trial court submits the case to the jury, though it thinks the evidence insufficient, final determination of the case is greatly expedited. If the jury agrees with the court's appraisal of the evidence, and returns a verdict for the party who moved for a directed verdict, the case is at an end. If the jury brings in a different verdict, the trial court can grant judgment notwithstanding the verdict. Then if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial." *Id.* at 586.

This Circuit agrees. *See Fratta v. Grace Line, Inc.*, 139 F.2d 743, 744 (2d Cir. 1943) and *Lindeman v. Textron, Inc.*, 229 F.2d 273, 276 (2d Cir. 1956). *But see Gratian v. General Dynamics, Inc.*, 587 F.2d 121, 122 (2d Cir., 1978) and *Ianuzzi v. South African Marine Corp.*, 510 F.2d 950 (2d Cir. 1975) for examples of exceptional situations where a directed verdict is appropriate.

depositions without reading them. (Supp. App. 13–14). In view of the judgment n. o. v. for South African, the third party action was dismissed as moot.

Mattivi is now arguing on appeal that there was sufficient evidence in the record to support the verdict of the jury and that it was error for the trial court to grant judgment n. o. v. merely because it drew different conclusions from the facts than those fairly drawn by the jury. South African argues that the plaintiff's failure to prove the presence of a dangerous condition, notice, or causation gave the trial court no choice but to set the verdict aside. In holding the trial court properly granted judgment n. o. v., we are led to consider what the standard for finding sufficiency of evidence is in post-1972 LHWCA cases.

 In the Second Circuit, the guiding principle trial courts apply when deciding whether to grant judgment n. o. v. for insufficiency of evidence is "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there· can be but one conclusion as to the verdict that reasonable men could have reached." *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970).[3] Judge Anderson elaborated on this general standard in *Armstrong v. Commerce Tankers Corp.*, 423 F.2d 957 (2d Cir.) *cert. denied*, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970), a case involving a seaman's suit against his ship's owner for a thumb injury allegedly caused by his fellow seaman. The jury returned a verdict for the seaman, and the trial court granted the shipowner's motion for judgment n. o. v. Judge Anderson said:

"There was . . . no evidence of any act, negligent or otherwise, committed by either [of the plaintiff's fellow seamen] which related to the injury, and the trial judge properly granted the motion to set aside the verdict in favor of the plaintiff and entered judgment n. o. v. for the defendants. Whether the motion is one to direct a verdict or to set aside a verdict which the jury has returned, the test applied by the court is the same. The evidence must be viewed in the light most favorable to the party other than the movant. The motion will be granted only if (1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him. [citations omitted].

\*　　\*　　\*　　\*　　\*　　\*

Although, as this Circuit has emphasized before, a jury's verdict is not lightly to be set aside, it is apparent that the jury's finding that some act of negligence was performed by the plaintiff's shipmates was sheer surmise and conjecture". *Id.* at 959–60.

*See also Traupman v. American Dredging Co.*, 470 F.2d 736 (2d Cir. 1972) and *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969). Thus, when deciding whether to grant a judgment n. o. v., the trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evi-

---

**3.** *See generally* 9 Wright & Miller, *Federal Practice & Procedure* § 2524 at 545–46 (1971). We note in passing that a motion for judgment n. o. v. cannot be made unless a motion for a directed verdict previously was made by the moving party at the close of all the evidence. *See Oliveras v. American Export Isbrandtsen Lines, Inc.*, 431 F.2d 814, 816–17 (2d Cir. 1970). A motion for judgment n. o. v., therefore, is technically a renewal of the directed verdict motion, and the standard for granting them is the same. The plaintiff's unsubstantiated claim that the trial judge's grant of judgment n.

o. v. violated his Seventh Amendment right to a jury trial is frivolous. The constitutionality of directed verdicts and judgments n. o. v. is well-established. *Galloway v. United States*, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943), settled the constitutionality of directed verdicts, and *Baltimore & Carolina Line v. Redman*, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636 (1935), as supplemented by *Neely v. Martin K. Eby Construction Co.*, 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967), established the constitutionality of judgment n. o. v.

dence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n. o. v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

▆▆ This Court has repeatedly attempted to clear up the confusion left in the wake of the 1972 amendments to the LHWCA, and no purpose would be served by another discussion of the intent and effect of those amendments.[4] It is by now sufficient for us merely to state that the 1972 Amendments to the LHWCA replaced the doctrine of unseaworthiness and the shipowner's non-delegable duty to provide a safe place to work with land-based principles of negligence as the standard of care owed to longshoremen and harbor workers by shipowners. Under land-based principles of negligence, a LHWCA plaintiff cannot prevail on his personal injury claim unless he proves by a preponderance of the evidence: (1) that a dangerous condition actually existed on the ship; (2) that the defendant shipowner had notice of the dangerous condition (and should have reasonably anticipated the plaintiff might be injured by it); and (3) that if the shipowner was negligent, such negligence proximately caused the plaintiff's injuries. If the LHWCA plaintiff fails to establish any of these elements, then the verdict must be for the defendant shipowner.

▆▆ Principles are by their very nature skeletal, and require the flesh and blood of cases to come to life. The elements of the above stated principle have been duly elucidated by cases handed down in this Circuit

during the last decade. As for the element of a dangerous condition, we turn to *Rice v. Atlantic Gulf & Pacific Co.*, 484 F.2d 1318, 1321 (2d Cir. 1973):

"A seaman is not entitled to a deck or ladder that is free of all oil or grease. Unseaworthiness exists only when the oil or grease creates such a condition of slipperiness that the deck or stairway is no longer reasonably fit for its intended use by the crew".

Since this language was spoken in reference to a Jones Act plaintiff who "shoulders a lighter burden [for establishing negligence] then his counterpart on land would carry", *McMillan v. Marine Sulphur Shipping Corp.*, 607 F.2d 1034, 1039 (1979), citing Gilmore & Black, *Admiralty*, §§ 6–35, 6–36 (2d ed. 1975), it is *a fortiori* applicable to the claim of a LHWCA plaintiff governed by a heavier land-based burden of proof. In Mattivi's case, there was no proof indicating that a couple drops of oil allegedly spilled at 9:30 A.M. on a wooden platform constituted a dangerous condition, or even that the drops still existed at 11:00 A.M. when the fall occurred.

There are numerous cases explicating the degree of notice that will render a shipowner liable. One of the most recent is *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682 (2d Cir.) cert. denied, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978), which held that a shipowner cannot be held liable for physical injuries invitees suffer due to non-obvious dangerous conditions unless the shipowner knows or should have known of the condition. *Ruffino v. Scinda Steam Navigation Co.*, 559 F.2d 861 (2d Cir. 1977), held that a shipowner cannot be ruled liable for a dangerous condition created by an independent contractor unless the shipowner has actual or constructive knowledge the condition exists. *Giglio v. Farrell Lines, Inc.*, 613 F.2d 429 (2 Cir. 1980), recently applied the stan-

4. *See, e. g., Smith v. Eastern Seaboard Pile Driving, Inc.*, 604 F.2d 789 (2d Cir. 1979); *Munoz v. Flota Merchante Grancolombiana, S.A.*, 553 F.2d 837 (2d Cir. 1977); *Napoli v. Hellenic Lines*, 536 F.2d 505 (2d Cir. 1976); and *Landon v. Lief Hoegh and Co.*, 521 F.2d 756 (2d Cir. 1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 783,

46 L.Ed.2d 642 (1976). *See generally* H.R.Rep. No.92–1441, 92d Cong. 2d Sess., 1972 U.S.Code Cong. & Admin.News, p. 4698 *et seq.* and Comment, *Developing A Consistent Theory of Vessel Liability To Injured Longshoremen Under the LHWCA*, 45 Brooklyn L.Rev. 731 (1979).

dard of care embodied in § 343A of the Restatement of Torts 2d to a LHWCA claim, holding that a shipowner is not liable to invitees for physical harm caused by an obvious condition unless the shipowner could have anticipated the harm despite the obviousness.[5] In Mattivi's case, there was no evidence establishing that he notified the ship of the drops of oil (he never ascertained the identity of the three men or established by whom they were employed). Furthermore, even if the shipowner had been notified of the condition there was no showing that there was any reason why the shipowner should have anticipated Mattivi would be injured by it or be unable to avoid it.

As for the element of causation, this Court recently endorsed the following statement of the burden carried by LHWCA plaintiffs for showing negligence:

"The plaintiff must establish directly or by just inference some want of care on the part of the master or the crew of the ship to which his injury may fairly and reasonably be traced. It is not enough for the plaintiff to prove that the negligence might perhaps have caused the injury. If the injury complained of might well have resulted from one of many causes, it is incumbent upon the plaintiff to produce evidence which will exclude the operation of those causes for which the master or the crew is under no legal obligation. If the cause of the injury may be as reasonably attributed to an act for which the master and crew are not liable as to one for which they are, the plaintiff has not sustained the burden of fastening tortious conduct upon the master or crew. The evidence showing negligence must come from witnesses who speak as knowers, not as guessers." McMillan v. Marine Sulphur Shipping Co., 607 F.2d 1034, 1036–37 (1979), quoting 1A Benedict, Admiralty § 118 at 6–25 (7th ed. 1979).

In the instant case, Mattivi failed to show that any negligence on the part of South African caused his injury. Mattivi was not employed by South African or the oil barges, and South African was not responsible for the carpentry work performed by Mattivi and his co-workers. There was no proof of who was actually responsible for spilling the oil. Mattivi himself merely speculated that it was oil he had slipped on since he did not see the hose or oil before he fell and did not investigate the cause of the fall afterwards. There is simply no evidence of any negligence on South African's part, much less evidence of negligence that proximately caused Mattivi's fall. In short, the entire case against South African depended on Mattivi's guessing rather than his knowing.

Given this factual and legal background, it is understandable that the trial judge had serious doubts as to the merits of Mattivi's case. Despite these misgivings, however, he very properly reserved decision on South African's motion for a directed verdict and allowed the case to go to the jury. When the jury returned a verdict in favor of Mattivi, the trial judge was confronted with a motion for judgment n. o. v. Without weighing the evidence, passing on the credibility of the witness, or substituting its judgment for that of the jury, the trial court looked at the evidence in a light most favorable to Mattivi and correctly concluded that given the complete absence of substantial evidence supporting the verdict the jury's finding could only have been the result of sheer surmise and conjecture.

In summary, "there is simply no basis for finding fault on the part of the ship . . . compatible with Congress' direction that recovery against the ships may be had only on proof of negligence pursuant to land-based standards". McMillan, supra, at 1039. The trial court's application of the standard for ruling on the sufficiency of evidence in LHWCA cases was entirely proper. The entry of judgment n. o. v. in favor of South African is affirmed.

---

**5.** This standard has been consistently applied by this Court. See Napoli, supra; Lubrano v. · Royal Netherlands Steamship Co., 572 F.2d 364, 366 (2d Cir. 1978); Lopez v. A/S D/S Svendborg, 581 F.2d 319, 323 (2d Cir. 1978); and Canizzo v. Farrell Lines, Inc., supra.