**Harry J. DIEBOLD, Plaintiff-Appellant,**

v.

**MOORE McCORMACK BULK TRANSPORT LINES, INC., Defendant-Appellee.**

**No. 207, Docket 86-7399.**

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1986.

Decided Nov. 6, 1986.

Jack Steinman, New York City (Tabak & Mellusi, of counsel), for plaintiff-appellant.

James M. Hazen, New York City (Joseph T. Stearns, Leonard Kennedy & Stearns, of counsel), for defendant-appellee.

Before MANSFIELD, KEARSE and ALTIMARI, Circuit Judges.

MANSFIELD, Circuit Judge:

Harry J. Diebold, a bosun, appeals from a judgment of the Southern District of New York, Charles M. Metzner, J., dismissing his action for damages for personal injuries sustained as the result of an accident which occurred while he was working as a member of the crew of the defendant's

ship S.S. MORMACSUN. The action is based on negligence under the Jones Act, 46 U.S.C. § 688, and the law of unseaworthiness. The judgment was entered pursuant to the court's order directing a verdict for the defendant at the close of the plaintiff's case. We reverse.

The facts, as testified to by the plaintiff, whose testimony must be viewed most favorably to him upon our review of a directed verdict for the defendant, *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 168 (2d Cir.1980), were as follows. On the morning of January 13, 1984, the plaintiff, a bosun, acting pursuant to the orders of his immediate superior, Chief Mate William Smith, removed a metal step located inside a room called a "locker" and just below a watertight entrance door, aboard the MORMACSUN so that chipping and painting of the locker could proceed. The entrance door, located in the bulkhead, was approximate 5½ feet high and 3 feet wide. At its bottom it was approximately 16–18 inches above the deck, with one metal step on each side. The inside step, located in the locker, was secured by four bolts attached to four legs which were secured to the deck by "padeyes", or semi-circular 3½ inch-high pieces of steel in the form of upside-down "U's" welded to the deck, through which nuts and bolts were secured to hold the steps in place. Once the steps were removed, the four padeyes protruded approximately 3½ inches up from the deck in the area below the inside door-opening.

As the chipping of paint in the locker was in progress after the step had been removed, the Chief Mate ordered the plaintiff and his men to start cleaning tanks. This task required the plaintiff and his crew to move certain heavy equipment from the locker through its door to the outside deck. The equipment included hoses (75 to 100 feet long), "saddles" (pieces of machinery about 3½ to 4 feet high) and lines. When the plaintiff asked the Chief Mate whether the metal step should not be put back in place for this operation, the Chief Mate, replying that it was a rush job and that there was not enough time, ordered the plaintiff to get some pallets and place them inside at the point below the locker door where the metal step had been removed, stating "that is it."

The pallets were wooden platforms about 4 by 4 feet in surface area and 4 or 5 inches high, consisting of 2– by 4–inch lumber as base pieces, covered by wooden slats about ½ inch in thickness and 3 to 4 inches in width. Ordinarily pallets, which are made of cheap wood and disposable, are not uniform in size and are used to keep cargo, such as drums or wire, above water that might be found in a ship's hold.

In order to create a temporary step up to the locker door from the inside, the plaintiff placed two pallets, one on top of the other, against the metal wall below the sill of the door and a third in front of them to create a step up from the inside to the two. However, when he tried to put the pallets between the exposed metal padeyes, it "didn't work". In order to gain elevation he then placed the two pallets on top of the padeyes. Since the temporary step thus created was "wobbly" he sought to steady it by placing under the pallets some light 3–inch by 2–inch pieces of wood, scrap and dunnage. The result was a makeshift, jury-rigged step.

Thereafter, the Chief Mate entered or looked into the locker, directed the plaintiff regarding the tanks that were to be cleaned, and departed. While the plaintiff, and a crew member were carrying heavy equipment out of the locker for use in the tank cleaning operation, the plaintiff stepped onto the temporary pallet-step, which then rocked, causing him to fall off, drop his end of the load, and suffer injuries.

On July 10, 1984, plaintiff commenced the present action, alleging, among other things, negligence based on the work order of the Chief Mate, failure to provide a reasonably safe place to work, and the existence of improper equipment. Defendant answered with a general denial and an affirmative defense to the effect that plaintiff's injuries were caused by his own negligence.

At trial the plaintiff introduced his own testimony as summarized above and that of a maritime expert, former Chief Officer James E. Byrnes, who had also served on merchant ships as a Chief Mate, and of a doctor. Byrnes testified that in the chain of command of a U.S. merchant vessel such as the MORMACSUN a bosun is obligated to obey the orders of the Chief Mate, even if those orders result in an unsafe condition. According to Byrnes, the bosun could change such an alleged unsafe condition only with the permission of the Chief Mate, and the Chief Mate in the present case should have ordered Diebold to put the metal step back in place rather than direct that pallets be used in its stead. Byrnes further testified that, once the Chief Mate ordered the plaintiff to use the pallets because of the need for speed and the plaintiff found that the pallets were unsafe, the plaintiff might have the "option" to advise the Chief Mate of the unsafe condition but that the plaintiff did not have the right to change the condition.

At the conclusion of the plaintiff's case the trial judge, without a written opinion, granted the defendant's motion to dismiss the complaint on the ground that the plaintiff had failed to establish a prima facie case. In a sometimes unclear exchange with plaintiff's counsel, the judge took the view that, although the plaintiff was bound to follow the Chief Mate's order to use the pallets rather than replace the step as the plaintiff had suggested, the Chief Mate had not instructed the plaintiff regarding how to set up the pallets, which might be arranged so that "they wouldn't be wobbly" and the plaintiff, once he discovered that the makeshift pallet substitute was wobbly and therefore unsafe, owed a duty to advise the Chief Mate of the unsafe condition, which the plaintiff did not do. This appeal followed.

## DISCUSSION

The controlling issue on this appeal is whether the trial judge erred in granting a directed verdict dismissing the complaint on the ground that the plaintiff was solely negligent and therefore barred as a matter of law from any recovery for injuries caused by negligence in assembling and using an unsafe step consisting of stacked pallets, as directed by his superior, the Chief Mate. The answer requires a brief review of applicable legal principles.

A directed verdict, like a judgment n.o.v., may be granted only when, viewing the evidence most favorably to the party other than the movant, "there can be but one conclusion as to the verdict that reasonable men could have reached." *Mattivi, supra,* 618 F.2d at 167 (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)). *See in accord Haskell v. Kaman Corp.,* 743 F.2d 113, 120 (2d Cir.1984); *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 688 (2d Cir.1983); *Doe v. New York City Department of Social Services, et al.,* 709 F.2d 782, 790 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Howes v. Great Lakes Press Corp.,* 679 F.2d 1023, 1030 (2d Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 452, 74 L.Ed.2d 605 (1982). The identical standard governs upon our review of the grant of a directed verdict. *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 121 (2d Cir.1984). We have described the standard in *Mattivi* as one whereby a directed verdict or judgment n.o.v. may be granted only when

> "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Mattivi, supra,* 618 F.2d at 168.

The threshold requirement for establishment of a prima facie case in Jones Act and Federal Employers' Liability Act cases is a liberal concept commensurate with the broad remedial purposes of these Acts. A plaintiff is entitled to go to the jury if "the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest,* in producing the injury ... for which damages are sought." *Rog-*

*ers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (emphasis supplied), *rehearing denied,* 353 U.S. 943, 77 S.Ct. 808, 1 L.Ed.2d 764 (1957). *See in accord Ferguson v. Moore-McCormack Lines,* 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957); *Johannessen v. Gulf Trading and Transp. Co.*, 633 F.2d 653, 656 (2d Cir.1980). This low and liberal standard, combined with the applicable principle of comparative negligence that does not bar recovery on grounds of contributory negligence or assumption of risk by the plaintiff in Jones Act cases, *Jacob v. New York City,* 315 U.S. 752, 755, 62 S.Ct. 854, 855, 86 L.Ed. 1166 (1942); *Socony-Vacuum Oil Co. v. Smith,* 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939), works in favor of submission of issues to the jury in such cases rather than toward foreclosure through a directed verdict or judgment n.o.v. *Rogers v. Missouri Pacific R. Co., supra,* 352 U.S. at 508, 77 S.Ct. at 449; *Johannessen, supra,* 633 F.2d at 656; *Eggert v. Norfolk & W. Ry. Co.*, 538 F.2d 509, 511 (2d Cir.1976). Plaintiff was required to prove by a preponderance of the evidence: "(1) that a dangerous condition actually existed on the ship; (2) that the defendant shipowner had notice of the dangerous condition and should have reasonably anticipated the plaintiff might be injured by it; and (3) that if the shipowner was negligent, such negligence proximately caused the plaintiff's injuries." *Mattivi, supra,* 618 F.2d at 168.

It is undisputed that a seaman may recover for injuries caused by his employer's requirement that he do his job in a dangerous manner when other safer methods are readily available, *see, e.g., Pedersen v. Diesel Tankers, Ira S. Bushey, Inc.,* 280 F.Supp. 421, 424 (S.D.N.Y.1967), or that he use equipment that is not reasonably fit for the safe performance of the task at hand. *Mitchell v. Trawler Racer, Inc.,* 362 U.S.

539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960).

Turning to the present case, the record is clear that when the plaintiff asked the Chief Mate whether the plaintiff should not put back in place the metal step, which was a safe method of ingress and egress, the Chief Mate, in the interest of saving time, ordered him to put together a makeshift step consisting of wooden pallets, which turned out to be "wobbly" and unsafe. A basis for a jury finding of negligence or unseaworthiness was furnished by the maritime expert's testimony that the pallets were not a reasonably safe substitute for the metal step and that the Chief Mate should have ordered the metal step to be put back, which would have taken 10 to 15 minutes longer than using pallets.

In directing a verdict for the defendant, the trial judge assumed that the fault was entirely that of the plaintiff, either because the pallets could have been used safely or because the plaintiff was obligated, once he discovered the unsafe condition, to notify the Chief Mate. In our view these assumptions were error since they are unsupported by any evidentiary predicate in the record. There is no evidence to support the trial judge's conclusion that the pallets could be put together in the location involved so that "they wouldn't be wobbly." Nor was there evidence that a bosun was under a duty, once he obeyed the Chief Mate's orders to use pallets instead of the metal step and found that the pallet assembly was "wobbly," to advise the Chief Mate of the condition before making use of it. The maritime expert did testify, in answer to a rather convoluted question, that the plaintiff "should have went to the Chief Mate and requested to put the step back." However, when asked the straight question of whether the plaintiff "would have the obligation to do so" the expert was not permitted by the judge to answer.[1] We do

---

1. The maritime expert's pertinent answers were as follows:

"Q If the bosun gets an order from the Chief Mate, to put some pallets down for temporary steps, does the bosun have discre-

tion to disregard that order and put the metal step back in place?

"A No.

"Q Does the bosun have the right to refuse a work order from the Chief Officer?

"A No.

not believe this record is adequate to support a conclusion that the plaintiff assumed such an obligation as part of the terms of his employment as a bosun.

Even if the pallet assembly could be used safely or the bosun had a duty to report its "wobbly" condition to the Chief Mate, this would not automatically require a finding that the plaintiff's fault in the method of assembling the pallets and in using them without first advising the Chief Mate of their condition made him 100% liable for the resulting accident. Absent further evidence, the jury would be entitled on the record before it to find some negligence on the part of the employer, even though

> "Q Is there a custom and practice regarding work orders that the Chief Officer tells the bosun what to do, the bosun doesn't like it and they have a discussion about it? Is there any custom and practice with regard to that?
> "A There is no discussion. It is cut and dried.
> "Q There is a custom and practice?
> "A Yes.
> "Q What is the custom and practice?
> "A You carry out the Chief Mate's orders."
> \* \* \* \* \* \*
> "Q Are pallets a suitable substitute for a metal step?
> "A No.
> "Q Do you have an opinion, with reasonable professional certainty, Chief Mate Byrnes, as to whether or not a direct order from a Chief Officer to a bosun to place wooden pallets in an area where a metal step has been taken away is a proper and prudent order? Do you have an opinion?
> "A Yes, I do.
> "Q And with reasonable professional certainty, what is your opinion, sir?
> "A I believe the steps should have been put back. I don't believe the pallets should have been put down.
> "Q Let me ask you this, sir. Would there be any big saving of time in putting down the pallets that had to be shored up and braced and not putting down the metal step?
> "A There might have been a saving of maybe 10 minutes, 15 minutes."
> \* \* \* \* \* \*
> "Q Sir, the question is, in the matter of the ordinary concourse between bosun and Chief Mate, man to man, if it were true that an order was given to use the pallets, and that proved to be unsuitable after the mate had left, wouldn't the bosun have been entitled, for his own safety and that of his men, to adjust it to the circumstances, as soon as he saw that the pallets could not be laid down flush, by taking them away and putting the step back?
> "A No. He should have went to the Chief Mate and requested to put the step back. You are asking—
> "THE COURT: That's your answer.
> "Q So he is supposed to leave, he's got this alleged rigging of pallets jacked up on one end at least four inches, sees the pallets won't work, according to his testimony, and you say

> he is then obliged to leave the locker, go out on deck, searching for the Chief Mate, in order to say to the Chief Mate, 'Chief Mate, your pallet idea is no good. The padeyes are in the way. Let me put the step back.' That's the drill aboard ship, you say?
> "A The reason for that is—
> "THE COURT: Yes or no?
> "THE WITNESS: Yes. That is the drill."
> \* \* \* \* \* \*
> "Q Would you agree, sir, that there is immense concern on the part of all people who sail aboard ships for the safety—
> "MR. TABAK: I am going to object.
> "THE COURT: Sustained.
> "Q Does the bosun—
> "THE COURT: The question of safety is not here, Mr. Stearns. The witness has said he should have gone to the Chief Mate and told him before he did it, that's all.
> "Q You are saying he would have the obligation to do so?
> "THE COURT: Next question, please. You've done that four times, now."
> \* \* \* \* \* \*
> "THE COURT: Now he has put up what the Chief Mate told him to do and now he finds it is unsafe, nothing to do with speed.
> "THE WITNESS: Correct.
> "THE COURT: What is his obligation?
> "THE WITNESS: He has none, because the Chief Mate ordered him to do it. And, under the chain of command, he can't change it. If the Chief Mate wants to have it changed, it would be up to him to change it, then.
> "THE COURT: Is there a duty by the bosun, when he sees that it is an unsafe condition, to go to the Chief Mate and say, 'Hey, it is unsafe. Not only does the step not take much more time'—because now speed is not the question anymore. In the first conversation speed was the question, not safety.
> "THE WITNESS: That is correct.
> "THE COURT: Now you find, when you do what the Chief Mate tells you to do, it is unsafe. Now you find out it is unsafe. Aren't you under an obligation to go to the Chief Mate and say, 'Hey, I did what you told me to, but it is unsafe'?
> "THE WITNESS: That would be his option, yes.
> "THE COURT: Okay.
> "Q Is it his obligation or his option?
> "THE COURT: Obligation, under the Second Circuit decision. Next question."

slight, and that the plaintiff was contributorily negligent.

The judgment of the district court is reversed and the case is remanded for a new trial.