**Whitney LOMBAS, Plaintiff,**

v.

**MORAN TOWING & TRANSPORTATION CO., INC., Defendant.**

No. 90 Civ. 4115 (JGK).

United States District Court, S.D. New York.

Sept. 8, 1995.

Daniel F. Hayes, Garden City, NY, for Lola Lombas, Whitney Lombas.

Fred R. Profeta, Profeta & Eisenstein, New York City, for Moran Towing & Transportation Co., Inc.

## OPINION AND ORDER

KOELTL, District Judge:

This action was brought under the Jones Act, 46 U.S.C.App. § 688. The plaintiff Whitney Lombas alleges that the injuries he suffered on April 8, 1988 while transferring a cable from the tug HEIDI MORAN to the tug JUDY MORAN, both operated by his employer the defendant Moran Towing and Transportation Co. ("Moran"), were due to Moran's negligence.[1]

At issue in this case is whether the plaintiff seaman can recover on negligence grounds from his employer for injuries sustained while dragging a cable across a wooden dock with a warped plank. The plaintiff fell on the dock while he was walking backwards dragging the cable. He and two other Moran captains were dragging the cable at the time. The plaintiff alleges that the defendant was negligent in two ways: (1) Moran required Lombas to perform his job in a dangerous manner when other safer methods were available, and (2) Moran failed to provide a reasonably safe place to work. Specifically, Lombas alleges that the cable transfer could have been done more safely by using one of the following alternatives: (1) moving the JUDY alongside the HEIDI to eliminate the necessity of dragging the cable across the pier; (2) asking a deckhand to assist the three captains in the manual transfer; (3) using the capstan; or (4) using a cherry-picker, which is a type of crane. The defendant denies that it was negligent and argues that the plaintiff may not recover for his injuries because his own negligence was the sole cause of the accident.

Following a three-day bench trial on liability[2] and after reviewing all of the submissions of the parties and having assessed the credibility of all of the witnesses, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Jurisdiction is based on the Jones Act, 46 U.S.C.App. § 688.

2. Plaintiff Whitney ("Sonny") Lombas is a resident of Cut Off, Louisiana. (Joint Pre-Trial Order, Undisputed Facts ("UF"), ¶ 1.)

3. Lombas began working for Moran in February 1988 (UF ¶ 9.) On April 8, 1988, Lombas was employed by Moran and was receiving pay from Moran at a Captain's rate. (UF ¶¶ 3, 4.) At the time he fell, Lombas had been going to sea for at least 24 years and had sailed as a tug captain since 1975. (UF ¶ 6.)

4. On April 8, 1988, Moran was the operator of the tugs JUDY MORAN and HEIDI MORAN. (UF ¶ 7.)

---

**1.** Plaintiff's claims based on the general maritime law of unseaworthiness and derivative claims by Lola Lombas, the plaintiff's wife, were withdrawn by stipulation. *See* Joint Pre-Trial Order at ¶ 1.

**2.** At the request of the parties, the trial on liability was bifurcated from any trial on damages before this case was assigned to this Court.

5. When Lombas first joined Moran, he served as captain of the ELIZABETH MORAN. (UF ¶ 9.) The ELIZABETH routinely towed the coal barge CARIBBEAN from Norfolk, Virginia, to Somerset, Massachusetts, and back. (UF ¶ 10.) The CARIBBEAN was a very large barge, sometimes called a "super barge." (UF ¶ 11.)

6. When the ELIZABETH was drydocked for repairs to its propellers, Lombas joined the JUDY MORAN. (UF ¶¶ 12, 13.)

7. Lombas joined the JUDY on or about April 7, 1988. (UF ¶ 13.) Bill Norgeot, a Moran supervisor, told Lombas to go to the JUDY to pick up the barge CARIBBEAN, which was then docked in Somerset, Massachusetts. (See Lombas 1995 Dep. at 83; Lombas Tr. Test.)

8. Wayne Savoie, a licensed tug Captain, joined the JUDY the day before Lombas did. (UF ¶ 14.) Malco Guidry, also a licensed tug Captain, joined the JUDY at or about the same time Lombas and Savoie did. (UF ¶ 14.)

9. There were wires or cables that were used to attach a tug to a barge like the CARIBBEAN when that tug was in the "notch" at the stern of the barge, and these were called make-up wires. (UF ¶ 17.) On April 8, 1988, there were make-up wires suitable for towing the CARIBBEAN that were located on board the tug HEIDI. (UF ¶ 20.) The tug JUDY, which was to go to Somerset, Massachusetts, to pick up the barge CARIBBEAN, did not have such cables aboard at the time. (UF ¶ 19.)

10. On April 8, 1988, the disabled HEIDI was tied up on the north side of the pier at the Moran Shipyard in Staten Island, New York. (UF ¶ 18.) Moran does not own or lease the real estate or premises known as the Moran Shipyard.[3]

11. On April 8, 1988, the JUDY arrived at the Moran Shipyard in order to pick up these cables from the HEIDI. (UF ¶ 21.) The JUDY docked on the south side of the finger pier, which juts out into the water roughly

perpendicular to the shore, across from the HEIDI. (UF ¶ 18.) The dock was about 45 feet wide. (DiNapoli Tr. Test.)

12. Each cable was two and one-quarter inches in diameter, made of steel, and 30 to 40 feet long. (Savoie Dep. at 32; Lombas 1990 Dep. at 80.) The weight of each cable was estimated to be a maximum of 374.4 pounds and a minimum of 260 pounds; however, 260 pounds is the more reasonable estimate for the cable at issue. (DiNapoli Tr. Test.; Borello Tr. Test.) The cable also had a socket at one end and a thimble at the other, which weighed 60 to 70 pounds and 20 pounds, respectively. (DiNapoli Tr. Test.; Borello Tr. Test.) In total, the cable plus its fittings weighed approximately 340 pounds. (Borello Tr. Test.; DiNapoli Tr. Test.)

13. On April 8, 1988, the Chief Engineer and a deckhand from the JUDY went to the HEIDI to help transfer the cables. (UF ¶ 24.)

14. Lombas, Guidry, and Savoie remained on the pier to receive the cables. (UF ¶ 25.)

15. The three captains undertook the cable transfer as a joint operation. (Savoie Dep. at 75.)

16. Lombas, Savoie, and Guidry grabbed a section of one of the cables and dragged it across the pier toward the JUDY on the other side of the dock. (UF ¶ 26.)

17. These three men then put that section of the cable down on the surface of the pier and grabbed another section, similarly pulling it towards the JUDY. (UF ¶ 27.)

18. While pulling the second section of the cable, Lombas was walking backwards and Guidry and Savoie were walking forwards toward the JUDY. (UF ¶ 28.)

19. Lombas tripped and fell while walking backwards with the cable. (UF ¶ 29.) After he fell, Lombas got up and continued working, and the three men finished transferring the cable. (Guidry Tr. Test.; Savoie Dep. at 26.)

---

**3.** Counsel for Moran represented that the owner of the pier was the Moran Shipyard Corporation and that both Moran Shipyard Corporation and the defendant Moran Towing & Transportation Co., Inc., were subsidiaries of Moran Towing Corporation. Letter from Fred Profeta to Daniel Hayes of 8/28/95.

20. Lombas was not looking where he was going as he walked backwards. (Lombas 1990 Dep. at 92–93.) Although Lombas testified at his deposition that he looked before he walked backwards, and although he testified at trial that he was trying to look where he was going, his testimony was somewhat inconsistent, self-serving, and not credible. Based on his deposition testimony and an assessment of his demeanor during his trial testimony, the Court finds that Lombas walked backwards and did not look where he was going.

21. No one instructed Lombas to walk backwards with the cable. (Lombas Tr. Test.; Lombas 1990 Dep. at 85; Savoie Dep. at 78.)

22. Lombas tripped over a board that was warped about one-half inch. (Lombas 1990 Dep. at 93; Guidry Tr. Test.)

23. Lombas had been on the pier quite a number of times before. (UF ¶ 30; Lombas 1990 Dep. at 92–94; Lombas Tr. Test.)

24. Lombas was aware of the condition of the dock. (Lombas 1990 Dep. at 111.)

25. There was no evidence that anyone had conveyed actual notice of the warped board to Moran, nor was there any evidence of how long the warped board existed, and there was no evidence of constructive notice to Moran.

26. Warping is a common condition on wooden decks. (Borello Tr. Test.)

27. Seamen on a tug boat customarily, regularly, and safely drag cables across the skid-proof surface of a ship's deck when "making up" with a barge. (Dalles Tr. Test.; DiNapoli Tr. Test.)

28. Three men customarily drag make-up wires across the steel deck of a tug. (Savoie Dep. at 71.)

29. Dragging cable on the dock is no more difficult than moving it on a deck: the friction created by the nonskid surface of a ship's deck is at least equal to if not greater than the friction on a wooden deck. (DiNapoli Tr. Test.)

30. No more men are needed to drag cables across a wooden deck than a skid-proof deck. (DiNapoli Tr. Test.)

31. It is common practice for two or three men to move 30 to 40 feet of cable manually across a dock. (Borello Tr. Test.; Guidry Tr. Test.; DiNapoli Tr. Test.) Based upon all of the extensive testimony, it is clear that three men was an adequate, safe, and reasonable work force to move the make-up wires across the dock from the HEIDI to the JUDY.

32. Lombas never suggested that more men be used in the transfer operation. (Savoie Dep. at 72.)

33. It would have been possible to use the capstan or "cathead" aboard the JUDY to drag the wire across the surface of the pier. (Savoie Dep. at 44.) No one involved in the operation suggested that they use the capstan, and no Moran employee told any of the captains not to use the capstan. (Savoie Dep. at 77.) Although this capstan could have been used to move the cable, there was no evidence that it would have been safer than manually moving the cable, as demonstrated by the fact that none of the tugboat captains, each of whom could have suggested using the capstan, decided to do so.

34. There was a crane colloquially called a "cherry-picker" on the Staten Island dock at the time of the cable transfer operation. The crane is used for transferring heavy loads from the tugs to the dock or from tug to tug. (Savoie Dep. at 26.) Savoie asked to use the crane, but he was told it was not available. (Savoie Dep. 27–28.)

35. Cherry-pickers are not normally used to move small loads like make-up wires. (Guidry Tr. Test.; DiNapoli Tr. Test.)

36. In any event, the cherry-picker was not available to move the cables on April 8, 1988 because it was being used to load a multi-ton generator onto the PATRICIA MORAN. (Borello Tr. Test.)

37. It would not have been more reasonable to bring the JUDY alongside the HEIDI and transfer the cables across the tugs rather than to transfer them across the dock. As Capt. DiNapoli explained, this method would have involved dealing with obstructions on the decks of both tugs. In addition, as Savoie testified, given where the HEIDI was

docked, it was not possible for the JUDY to move alongside and still let other traffic pass. (Savoie Dep. 77.) None of the three Captains suggested that this was a more reasonable or prudent way of transferring the cables on April 8. That method of operation would not have been a safer alternative for moving the cables.

38. It was safe, prudent, and reasonable for three men to drag the make-up cables for the CARIBBEAN across a wooden dock from the HEIDI to the JUDY. The operation was carried out in a safe, prudent, and reasonable manner, consistent with the way cables are often moved.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action pursuant to the Jones Act, 46 U.S.C.App. § 688.

■ 2. Under the Jones Act, a shipowner is liable for its employee's injuries if the employee proves by a preponderance of the evidence that the shipowner's "negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Ferguson v. Moore–McCormack Lines,* 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957) (quoting *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)); *Diebold v. Moore McCormack Bulk Transp. Lines, Inc.,* 805 F.2d 55, 57–58 (2d Cir.1986). Negligence is the failure to exercise reasonable care to provide the plaintiff with a reasonably safe place to work, reasonably safe conditions, tools or equipment, or the failure in any other way to exercise reasonable care under the circumstances. *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 327–28, 81 S.Ct. 6, 9, 5 L.Ed.2d 20 (1960); *Diebold,* 805 F.2d at 58; *Saleh v. United States,* 849 F.Supp. 886, 891–92 (S.D.N.Y.1994); 4 L. Sand, et al., Modern Federal Jury Instructions ¶ 90.02[3].

■ 3. Contributory negligence and assumption of risk [4] are not defenses in a Jones Act case; instead, the principles of comparative negligence apply. *Socony–Vacuum Oil Co. v. Smith,* 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939); *Diebold,* 805 F.2d at .58.

■ 4. To reduce its liability, the defendant shipowner must prove by a fair preponderance of the evidence that the plaintiff acted negligently by failing to exercise the care which a reasonably prudent man would have exercised under the circumstances. *Karvelis v. Constellation Lines, S.A.,* 806 F.2d 49, 53 (2d Cir.1986), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); *Brown v. OMI Corp.,* 863 F.Supp. 169, 170–71 (S.D.N.Y.1994).

■ 5. The seaman's mere knowledge of a dangerous condition will not reduce the shipowner's liability. *Rivera v. Farrell Lines, Inc.,* 474 F.2d 255, 257–58 (2d Cir.), *cert. denied,* 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973).

■ 6. Under the principles of comparative negligence, however, a seaman's recovery will be reduced if he knew or should have known of a safer alternative. *Webster v. United States,* 1995 WL 368429, *7 (S.D.N.Y. 1995) (citing cases); *Passantino v. States Marine Lines, Inc.,* 299 F.Supp. 1252, 1255–56 (S.D.N.Y.1969).

■ 7. It is well-established that if the plaintiff's own negligence is the sole cause of the injury—that is, if the defendant was not negligent—the plaintiff may not recover. *Sotell v. Maritime Overseas, Inc.,* 474 F.2d 794, 796 (2d Cir.1973); *Webster,* 1995 WL 368429, *7 (citing cases).

■ 8. A seaman may recover on negligence grounds when his employer requires him to perform a job "in a dangerous manner when other safer methods are readily available." *Diebold,* 805 F.2d at 58.

■ 9. There is no merit to plaintiff's argument that he was required to perform his job in a dangerous or unreasonable manner. Although there were other possible methods for transporting the cables from the

---

4. Assumption of risk is "the knowledgeable acceptance of a dangerous condition when acceptance is necessary for performance of duties."

*Rivera v. Farrell Lines, Inc.,* 474 U.S. 255, 257 (2d Cir.), *cert. denied,* 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973).

HEIDI to the JUDY, transporting the cables manually across the dock was a reasonable, prudent, and safe way to transport the cable from the HEIDI to the JUDY. There is no dispute that seamen on a tug boat customarily, regularly, and safely drag the very same cables across the skid-proof surface of a ship's deck when "making up" with a barge, and it was common practice for two or three men to move 30 to 40 feet of cables manually across a dock. There was extensive testimony at trial, which the Court finds credible, that this procedure and the number of men involved in moving these cables was customary and reasonable. For example, Capt. DiNapoli, a graduate of the Merchant Marine Academy and a licensed master as well as a very credible witness, explained that three seamen commonly drag cables of the size at issue in this case. Three men comprise an adequate work force for such a task because by dragging the cables in sections, the weight of the cables is divided. DiNapoli testified that it was reasonable for three men to move the cables at issue in this case even if the cables weighed the maximum estimated weight. *See also* Findings of Fact 28–32. Both the number of men involved and the nature of the cable transfer operation on April 8, 1988 were reasonable, prudent, and safe.

10. Because the Court finds that it was not negligent at all for three captains to transfer the cables manually across the dock, the availability of other methods of transferring cables is irrelevant.

11. In addition, the plaintiff failed to show that there were any alternatives that offered a safer method of transferring the cables. As explained in the findings of fact, although the capstan could have been used, it was not a demonstrably safer alternative. Although a cherry-picker could have been used, its capacity was far greater than was needed, and it was not available. Although the plaintiff failed to demonstrate that the tugs could be pulled alongside each other at the dock that day, and Savoie did not think they could be, transferring cables across

decks full of obstructions was not a safer method of transferring the cables.

12. Moreover, it is clear that Lombas was in no sense required to perform his job in an unreasonable or unsafe manner. No one instructed Lombas to walk backwards or not to look where he was going. Those were all choices he made.

13. Plaintiff's alternative argument that he was provided with an unreasonably dangerous place in which to work also has no merit.[5] In negligence claims under the Jones Act, the plaintiff must prove the following by a preponderance of the evidence: "(1) that a dangerous condition actually existed on the ship; (2) that the defendant shipowner had notice of the dangerous condition and should have reasonably anticipated the plaintiff might be injured by it; and (3) that if the shipowner was negligent, such negligence proximately caused the plaintiff's injuries." *Diebold,* 805 F.2d at 58 (citing *Mattivi v. South African Marine Corp.,* 618 F.2d 163, 168 (2d Cir.1980)); *Webster,* 1995 WL 368429, *7. The plaintiff failed to prove each of these elements by a preponderance of the evidence.

14. The warped board on the dock did not present an dangerous condition. Courts have commonly declined to hold shipowners liable when injured employees fail to establish that the allegedly dangerous condition was different from what a seaman would ordinarily and reasonably expect to find. *See, e.g., Jones v. Moore–McCormack Lines, Inc.,* 291 F.Supp. 888, 890 (S.D.N.Y.1968) (declining to hold a shipowner liable for a seaman's injuries sustained when he tripped over a coiled cable). Warping is not an unusual condition on docks, and certainly one an experienced mariner like Lombas should expect. There is no evidence that the condition of the dock was unusual or unreasonable.

In addition, a mere half-inch of warping is not significant enough to constitute an actionable defect. Courts have often found that differences of up to two inches in the level of

**5.** The defendant does not assert that it cannot be liable for Lombas's injuries because it is not the owner of the Staten Island pier where the JUDY was docked. Indeed there was testimony that the defendant's agents made repairs to the dock and took some responsibility for the condition of the dock.

the surface of a walking area could not support a verdict in favor of a plaintiff's negligence claim. *See, e.g., Allen v. Carr,* 28 A.D.2d 155, 284 N.Y.S.2d 796 (4th Dep't 1967), *aff'd,* 22 N.Y.2d 924, 242 N.E.2d 87, 295 N.Y.S.2d 52 (1968) (citing cases); *Holmes v. New York,* 5 Misc.2d 838, 839, 161 N.Y.S.2d 913, 914 (N.Y.Ct.Claims 1957) (three-eighths to five-eighths of an inch variations in the level of a sidewalks "too small and insignificant to be called defects"); *Pearson v. Mallory S.S. Co.,* 278 F. 175, 176 (5th Cir.1922) (denying recovery for injuries sustained from tripping over 2″ board nailed over hole on a dock). In this case, the condition of the dock was not unreasonable or unexpected.

15. The plaintiff presented no evidence that the defendant had any notice whatsoever about the warped board about which he is now complaining or any evidence as to when the condition occurred.

16. The defendant's actions did not proximately cause the accident. A supervisor did not direct Lombas to walk backwards with the cable without looking where he was going.

17. Finally, the plaintiff cannot recover because his own negligence was the sole proximate cause of his injuries. When the plaintiff's own negligence is the sole cause of his injuries, the plaintiff cannot recover under the Jones Act. *See Sotell,* 474 F.2d at 796; *Webster,* 1995 WL 368429, \*7; *Gillikin v. United States,* 1989 WL 138765, \*3 (E.D.N.Y.1989); *Spearing v. Manhattan Oil Transp. Corp.,* 375 F.Supp. 764, 773 (S.D.N.Y.1974). In this case, the warping on the dock was not hidden, and the plaintiff did not offer any reason why he did not see the alleged defect before he tripped. Lombas simply did not look where he was going as he carried the cable.[6] The unjustifiable failure to use one's senses constitutes negligence. *See Passantino,* 299 F.Supp. at 1255 (determining that the plaintiff was negligent be-

cause "[h]e did not make reasonable use of his senses and intelligence to discover dangers to which he was or might be exposed.... He quite simply failed to use due care for his own health and well-being and his negligence did not merely contribute to this accident, but it was its sole cause."); *Holmes v. New York,* 5 Misc.2d 838, 839, 161 N.Y.S.2d 913, 914 (N.Y.Ct.Claims 1957) (denying recovery and finding plaintiff "guilty of failing to watch her path as is expected of an ordinarily prudent person"). Although comparative negligence principles apply to Jones Act cases, in this case there is no negligence on the part of the employer, and the negligence is exclusively that of the plaintiff. A seaman cannot recover when, as here, his negligence is the sole cause of his injury.

18. The defendant further asserts that even if it were negligent to transport the cables manually across the dock, Lombas may not recover because a captain's negligence serves as an absolute bar. The defendant relies on Judge Learned Hand's opinion in *Walker v. Lykes Bros. S.S. Co., Inc.,* 193 F.2d 772 (2d Cir.1952), where the Court of Appeals held that a master could not recover for injuries sustained from a defective file cabinet because the master knew the cabinet was defective, had the responsibility to see that it was fixed, had ample opportunity to do so, and failed to do so. Under the *Walker* doctrine, an employee cannot recover for his injuries when he breaches "a duty which [he] has consciously assumed as a term of his employment." *Id.* at 773. The defendant argues that even if the cable transfer operation was negligently conceived, Lombas may not recover for any injuries sustained during that operation because he breached his duty as the ship's master to assure the transfer was conducted safely.

Although it is not necessary to apply the *Walker* doctrine in this case, the court notes that the doctrine is of questionable continued viability in this Circuit. *See McSpirit v.*

---

**6.** Q: You were moving backwards, weren't you?
A: Yes, sir.
Q: So you weren't looking where you were going?
A: I looked before.
Q: You looked before you did it?
A: Yes.

Q: When you were actually moving you weren't looking?
A: No.
Q: So didn't see what you actually tripped on?
A: No, sir, until afterwards.
Lombas 1990 Dep. at 92–93.

*Great Lakes Int'l,* 882 F.Supp. 1430, 1432 (S.D.N.Y.1995) (noting that *"Walker'*s continuing viability is doubtful"). In *Dunbar v. Henry Du Bois' Sons Co., Inc.,* 275 F.2d 304, 306 (2d Cir.), *cert. denied,* 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46 (1960), two of the three judges on a panel of the Court of Appeals expressly rejected the *Walker* doctrine as "incompatible with the congressional mandate that contributory negligence and assumption of risk shall not bar recovery in a Jones Act case." *Id.* at 306. Even if the doctrine remains viable, however, it is questionable whether it could bar recovery in this case. The facts of who the JUDY's master was on April 8, 1988 are very much in dispute. Although the plaintiff relies on his own testimony and that of Savoie to state that Savoie was in command of the JUDY, Savoie was only 27 years old, not nearly as experienced as Lombas, and unlikely to be entrusted with the task of being the master of the JUDY for the purpose of towing the barge CARIBBEAN. The testimony of both men appears to be self-serving. The testimony of Capt. Guidry appeared far more reasonable and straight-forward when he testified that Capt. Lombas was in charge of the JUDY. In any event, even if Savoie were in charge of the JUDY on April 8, 1988 when Lombas was on board the JUDY, even Savoie testified that the cable transfer operation was a joint operation among the three men. *See* Savoie Dep. at 75 (stating that it was a "joint decision" to ask for the cherry-picker and that "[the cable transfer] was a joint job.").[7] The facts of this case are very different from the specific employment obligations that were imposed on the master in the *Walker* case. It would not make sense on the facts or the law to apply the *Walker* doctrine in this case, and the Court has not relied upon it in finding that the plaintiff is not entitled to recover because he has failed to prove by a preponderance of the evidence that the defendant was negligent at all. Moreover, the evidence establishes that the plaintiff's injuries were caused solely by his own negligence.

For all of the foregoing reasons, the defendant's motion for judgment at the close of all the evidence is granted, and judgment is ordered to be entered for the defendant dismissing the plaintiff's complaint with prejudice.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

**SO ORDERED.**

---

7.  Q: Was it a joint decision on your part to ask for the cherry picker?
    A: Yes.
    Q: Was that the way this entire transfer operation was carried out that is by joint decision?
    [Objection to form]

Q: Were the details of this operation, the moving of the cables—I should say the makeup wires a matter of joint decision? [Objection to form]
A: It was a joint job. We all did it.
Savoie Dep. at 75.