**Ahmed Musaed SALEH, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 92 Civ. 3646 (CHT).**

United States District Court, S.D. New York.

April 15, 1994.

Tabak & Mellusi, New York City (Jacob Shisha, of counsel), for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., Mary Jo White, U.S. Atty., Janis G. Schulmeisters, Atty. in Charge, Torts Branch, Civ. Div., U.S. Dept. of Justice, New York City (Jack S. Rockafellow, Sara McAndrews, of counsel), for defendant.

## OPINION AND ORDER

TENNEY, District Judge.

Ahmed Musaed Saleh ("Saleh"), plaintiff, brings this admiralty suit against defendant, the United States of America (the "United States"), under the Jones Act, 46 U.S.C. § 688 (1988), to recover money damages for pain and suffering, loss of employment, and medical fees in connection with an injury allegedly suffered aboard the S/S Maine (the "Maine"), a United States merchant vessel. Plaintiff also brings claims for unseaworthiness under general maritime law. Jurisdiction over the suit is proper under 28 U.S.C. § 1333 (1988). The Maine is owned by the United States and operated by American Foreign Shipping Co. ("American Foreign"), a private agent. The United States concedes to jurisdiction under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq. (1988). This court held a bench trial on October 20, 21, and 22, 1993. At the close of trial both parties moved for judgment in their favor pursuant to Fed.R.Civ.P. 52(c). For the following reasons, the plaintiff's motion is denied and the defendant's motion is granted.

## FACTS

Pursuant to Fed.R.Civ.P. 52(a), the court finds the following facts:

1. Saleh claims that at some point between March 13 and March 18, 1991 as the Maine proceeded from Djibouti to Jabal Ali, at approximately 0730 hours (7:30 a.m.), he slipped and fell down a ladder well leading from the ship's galley to the store room. Pl.Mem. of Law, Prop. Finding 9.

2. Saleh claims that he slipped on grease, oil and water that had accumulated on ladder steps worn from years of use. He claims that these steps were a safety hazard and unseaworthy. Pl.Mem. of Law, Prop. Findings 6, 7 8 & 9.

3. Saleh is a naturalized United States citizen and was born in Yemen on January 1, 1952. At the time of trial he was 41 years old. Joint Pre–Trial Order ("JPTO") undisputed facts at 2. Aside from learning to read and write Arabic, Saleh has no formal education or training and was a farmer before migrating to the United States in 1976. Saleh Dep. at 10, 19.

4. Since migrating to the United States, Saleh has been a part owner of two small grocery stores, a worker in an automobile factory, and was employed cleaning a build-

ing for a short period of time. Saleh Dep. at 13–17. His last known employment was as a merchant seaman aboard the Maine.

5. Saleh became a member of the National Maritime Union ("NMU") approximately in 1982. Saleh Dep. at 42. However, Saleh was not actually employed as a merchant seaman until January 29, 1991, when he joined the S/S Maine in Livorno, Italy. *Id.* at 41–42, 62.

6. The Maine is a freighter approximately 540 feet long with a beam of 68 feet and molded depth of 79 feet. She was built in 1944 and is owned by the United States. JPTO, Undisputed Facts at 2.

7. Prior to the events in question in this suit, the Maine was out of active service for five years. She was reactivated late in 1990 in response to Operation Desert Storm/Desert Shield (the "Gulf war"). Snyder Dep. at 71–74.

8. Because of the pressing need for ships and crew members created by the Gulf war, Saleh joined the Maine without first receiving training in ship safety at a union school. Trial Transcript ("Tr.") at 18. From the evidence presented at trial, the nature and extent of the safety training provided on board the Maine is unclear. Tr. at 22; Snyder Dep. at 78. In any event, testimony established that Saleh was aware of the precautions to be taken when proceeding down the ladderwell steps—the activity he was engaged in at the time of the accident. Saleh Dep. at 105 (holding handrails); Colon Dep. at 37.

9. On board the Maine, Saleh served as a steward utility in the officers' mess, a position he held until the crew was discharged and the vessel laid up in Port Arthur, Texas on May 6, 1991. As a steward utility, Saleh served food to the officers and cleaned the officer's galley. In addition, he worked overtime throughout the voyage, mostly painting in the ship's engine room. Saleh Dep. at 62, 67.

10. Sometime between March 13 and March 18, 1991, at approximately 7:30 a.m., Saleh went from the officers' mess on the poop deck to the store room on the main deck to get milk for the officers' breakfast.

In order to do so, he had to navigate a ladderwell leading aft of the vessel connecting the two decks. Saleh Dep. at 91, 93–94.

11. According to Saleh, he slipped on oil, grease and water that accumulated on the ladder steps and then he slid down the steps, landing on the bottom platform. Upon landing, he injured his back and left hand and received tiny metal slivers in his back from the steps. Tr. at 44–50.

12. The ladder where Saleh's injury allegedly took place is an inside ladder running between the poop deck and the main deck. The ladder has handrails on both sides, the distance between them being 24 inches. There is a landing at the bottom of the ladderwell, on the main deck level, which extends 42 inches from the bottom step to a wall across from it. Coulombe Dep. at 43–50; Tr. at 139, 141.

13. At the top of the ladderwell is a landing approximately five feet long. Tr. at 33. At the end of this landing is a watertight door leading to the outside poop deck. This door is kept open in good weather and there is a six to eight foot overhang outside the hatchway. Coulombe Dep. at 43–50. According to Saleh, the watertight door was open on the day of the accident, allowing rain water to be blown in. Tr. at 39–41. The ladder steps, which are covered with diamond shaped ridges to prevent slippage, appear worn in recent photos admitted as evidence in this trial, and, according to Saleh, were equally worn at the time of his accident. Pl.Exh. 4; Tr. at 43. However, Saleh does not claim, nor does the evidence presented warrant, that the worn condition of the steps alone is sufficient to establish the Maine's unseaworthiness or the defendant's negligence.

14. At trial and in his pre-trial deposition, Saleh claims that he was assisted immediately after his fall by a shipmate, Nagi Ahmed. However, this account is contradicted by a previous account of the accident given to Chief Mate Kevin Coulombe, the ship's medical officer. Def.Exh. E (see *infra* at 889–90). Also, Saleh chose not to call Nagi Ahmed as a witness although he was apparently within the court's jurisdiction and may have provid-

ed probative testimony concerning the circumstances of the accident, especially the condition of the ladderwell steps. Tr. at 130. While the court does not draw any negative inferences from Ahmed's failure to testify, it notes that such testimony may have been helpful and without it the court is left only to Saleh's account of the circumstances giving rise to his injury.[1]

15. According to Saleh, it was raining on the day of his accident and the rain was blown onto the ladderwell steps, creating a slipping hazard. However, the court attaches no weight to this account because, on each of the proposed dates given by Saleh as the date of the accident, there was no record of rain or inclement weather at the time of the alleged accident in the deck log maintained by the ship's watch officer, Second Mate S. Roberto. Def.Exh. U. Furthermore, credible testimony established that the hatchway door to the outside poop deck would generally be closed in heavy rain, preventing any rain from being blown in. Colon Dep. at 39.

16. Saleh also maintains that Maine was in rough seas at the time of his accident, such that the ship was rolling and items were falling from shelves and tables. Saleh Dep. at 120. However, the court attaches little weight to this testimony because the ship's log for the relevant period indicates that the Maine was proceeding through light seas at that time. Def.Exh. U; Snyder Dep. at 66–67. On the one date in question when seas actually were rough, March 17, 1991, the log indicates that the ship was riding the swell in such a way that only minimal rolling would result. Snyder Dep. at 63–66.

17. Saleh also testified that the steps upon which he slipped were covered with grease and oil that had been tracked through the ship by crew members going to and from the engine room, which was accessible from the poop deck by the ladderwell. Tr. at 48. The plaintiff, however, cannot specifically recall ever noticing whether there was oil and grease on the steps prior to his accident. *Id.* Nor can he recall noticing oil and grease on the steps on the day of his accident. *Id.* Rather, he remembers that after he had fallen down the ladderwell, his hands and his shoes were covered with oil and grease from the steps. Tr. at 48, 145. This recollection does not persuade the court that an unreasonable or unsafe amount of oil or grease was present on the ladderwell steps. The court's impression is bolstered by other evidence in this case, including testimony by the two Chief Mates and by Chief Steward Colon, none of whom testified to seeing the ladderwell steps in a dangerous condition at any time during the voyage. Coulombe Dep. at 50; Snyder Dep. at 22; Colon Dep. at 54.

18. On February 25 and March 2, 1991, Saleh complained of stomach problems to Chief Mate Edward Snyder and was treated. Pl.Exh. 5. His only other medical complaint was lodged with second Chief Mate Kevin Coulombe, in a Report of Personal Injury dated 4/30/91 (the "Report").[2] Def.Exh. E.

19. The Report was made by Chief Mate Coulombe after interviewing Saleh and since it pertains to the subject matter of this lawsuit it is reproduced, in relevant part, below: [3]

1. While the court understands that Mr. Ahmed did not actually witness Saleh's accident, he may have been able to corroborate Saleh's story concerning the circumstances of the accident—such as time and location and the condition of the ladderwell.

2. Saleh claims that he notified both the Chief Steward Rafael Colon, his immediate supervisor, and Chief Mate Edward Snyder, the Maine's medical officer at the time of the alleged accident, shortly after his fall, and that Chief Mate Snyder told him to come back during office hours. However, this testimony is given little weight because neither Colon nor Snyder can remember any such notification. While it is

true, as Saleh claims, that this notification may not be remembered because it was made informally, without documentation, Snyder also testified that it was the sort of thing he would remember. Snyder Dep. at 47. Moreover, Snyder remembered other significant injuries on that voyage and both Snyder and Colon otherwise remembered the plaintiff and could describe him accurately. Snyder Dep. at 24–30; Colon Dep. at 60. Therefore, it is likely that Saleh actually did not notify anyone of the injury until six weeks after its alleged occurrence.

3. Printed portions of the Report are capitalized; typed portions are underlined.

1. NAME *Ahmed M. Saleh*

. . . .

5. DATE CREW PAID OFF FOR THIS VOYAGE ____
   (a) DATE EXPECTED TO TERMINATE VOYAGE 2 May 1991
   (b) PORT Houston, Texas
6. INJURY SUSTAINED: (a) DATE March 8, 1991 (b) HOUR 0700 (c) TO WHOM FIRST REPORTED Kevin G. Coulombe, C/Mate (d) WHEN 1800 4/30/91 (e) LOCATION OF VESSEL AT TIME OF ACCIDENT Sea, Ship had departed Djibouti
7. INJURED'S VERSION OF HOW ACCIDENT OCCURRED AND THE CAUSE THEREOF I slipped down the stair from the galley to the stewards rooms. It was morning around 0700. The ship was at sea. I was going down to get milk. I hurt my left hand and back.
   (Signed) Ahmed M. Saleh
   (INJURED'S SIGNATURE)

. . . . .

12. WITNESSES VERSION OF THE FOLLOWING: None
13. WHAT WAS DONE FOR MAN AFTER ACCIDENT—(NAME AND ADDRESS OF ATTENDING PHYSICIAN AND HOSPITAL, IF ANY? Under observation as of 4/30/91.

. . . . .

16. WAS MAN ABLE TO RETURN TO DUTY? Yes IF SO, WHEN? Immediately

. . . . .

18. REMARKS: Accident went unreported until 4/30/91. Extent of injuries unknown until 4/30/91. No complaint or assistance sought until 4/30/91. Did visit doctor in Djibouti. Problem diagnosed as gastritis. See Request for Medical Treatment 3/02/91.

NAMES AND RATING OF WITNESSES TO ACCIDENT, PERSONS ASSISTING IN WORK AND THOSE NEARBY (ATTACHED SIGNED STATEMENTS) None

Def. Exh. E.

20. Following Saleh's report to Chief Mate Coulombe, the Maine arrived in Houston, Texas. On May 3, 1991 Saleh visited the Pasadena Industrial Clinic and on May 4 he visited the Maritime Petrochem Clinic, both in Texas. He received a diagnosis of: inclusion cyst flexor tendon third finger and a sprain of the lumbar spine and abscess of the back. He was given the prescription drugs Norflex and Voltaren and metal slivers were removed from his back. JPTO, Undisputed Facts at 2–3.

21. Upon being discharged from the ship on May 6, 1991 and returning to New York City, Saleh began visiting the NMU Medical Clinic for continuing treatment of his back pain. On November 11, 1991, after physical therapy had failed to alleviate his persistent back pain, Saleh was advised by the Medical Administrator of the NMU Pension & Welfare Plan that he was permanently unfit for sea duty. JPTO, Undisputed Facts at 3.

22. Much of the testimony at trial concerned the variety of symptoms evinced by Saleh in the course of his medical examinations. Most of the attention focused on the degree to which Saleh's symptoms were objective as opposed to subjective, ostensibly reflecting the defendant's concern that Saleh was faking, or at least greatly exaggerating, the extent of his injuries. Testimony of defendant's expert Dr. Robert Swearingen, Tr. 320–79. The evidence presented sufficiently established that Saleh has suffered a serious back injury resulting in a midline disc herniation at L5–S1, and that this injury, while not currently impinging on a nerve root, is the probable cause of a considerable portion of his current discomfort.[4] Tr. at 243, 245.

4. At his deposition and at trial, Saleh testified to considerable and persistent pains in his back, neck, arms, legs and fingers. Tr. at 83; Saleh Dep. at 55. The defendant's medical expert, Dr. Robert Swearingen, testified that the variety and extent of Saleh's pains are unlikely to have all arisen from his sprained back, and, while the court is inclined to agree, there is no reason to doubt that Saleh's discomfort is genuine and is at least partially due to his disc herniation.

23. However, Saleh failed to present persuasive evidence, or indeed any probative evidence other than his own inconsistent testimony, concerning the manner and circumstances of his alleged accident aboard the Maine. While Saleh's medical expert, Dr. Enrique Ergas, who is one of his treating physicians at the NMU clinic, testified that the March, 1991 accident was the cause of Saleh's lumbar sprain and herniated disc "within a reasonable degree of medical certainty," his testimony is premised entirely upon the history of the accident as told to him by the plaintiff and is entitled to no greater deference. Tr. at 237, 281. Therefore, the court gives little probative value to Dr. Ergas' testimony concerning the cause of Saleh's injuries.

## DISCUSSION

### I. *Jones Act Claim*

46 U.S.C. § 688, commonly referred to as the Jones Act, provides a federal cause of action for seamen injured in the course of their employment as members of a vessel's crew due to the negligence of their employer.[5] See Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 277 (2d ed., 1975). While it has been noted that this section is to be liberally construed in the seaman's favor, it is not in effect a workman's compensation statute. *Lamon v. Standard Oil Co.*, 117 F.Supp. 831, 834 (D.La.1954). Rather, "the Jones Act plaintiff bears the burden of going forward with evidence on the essential elements of a negligence action: the existence of a duty; the negligent violation of the duty by defendant; and the causal relationship of violation to injury." Gilmore & Black at 377; see also *Williams v. United States*, 712 F.Supp. 1132, 1135 (S.D.N.Y.1989).

Unlike the claim of unseaworthiness under general maritime law, which is a form of liability without fault, Jones Act liability requires a ship owner or its agents and employees to breach a duty of reasonable care. See *Mitchell v. Trawler, Racer, Inc.*, 362 U.S. 539, 549, 80 S.Ct. 926, 932–33, 4 L.Ed.2d 941 (1960). However, while "the standard of liability under the Jones Act is that established by Congress under the Federal Employers' Liability Act," *Ferguson v. Moore–McCormack Lines, Inc.*, 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957), this does not mean that the duty of care under the two statutes is identical.

The duty of care applicable in FELA cases is that of "reasonable or ordinary care having regard to the circumstances." *Delaware, Lackawanna and Western Railroad Co. v. Koske*, 279 U.S. 7, 11, 49 S.Ct. 202, 204, 73 L.Ed. 578 (1929); it is what "a reasonable and prudent man would ordinarily have done under the circumstances of the situation." *Anderson v. Atchison, Topeka & Santa Fe Railway Co.*, 333 U.S. 821, 823, 68 S.Ct. 854, 855, 92 L.Ed. 1108 (1948). Because of the peculiar nature of Jones Act cases as suits in admiralty, however, and the status of seamen litigants as "wards of admiralty," which recognizes the "relation of dependence and submission" that emerges between the seaman and the shipowner, a shipowner's duty to his or her seamen is an "obligation of fostering protection." *Cortes v. Baltimore Insular Line, Inc.*, 287 U.S. 367, 377, 53 S.Ct. 173, 176, 77 L.Ed. 368 (1932). Thus, it has been suggested that a shipowner under the Jones Act proceeds under a higher duty of care than land based employers under FELA. See Gilmore & Black at 377.

---

**5.** The standard of liability under the Jones Act is the same as that under the Federal Employers' Liability Act ("FELA") 45 U.S.C. § 51 (1988), which it incorporates by reference. 46 U.S.C. § 688(a) states in relevant part:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railroad employees shall apply ...

45 U.S.C. § 51 states in pertinent part:

Every common carrier by railroad while engaging in commerce between any of the several States or territories ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its ... equipment.

■■ That said, a shipowner has a duty to provide seamen with a safe place to work and equipment that is reasonably fit for the safe performance of the task at hand. *Diebold v. Moore McCormack Bulk Transport Lines, Inc.*, 805 F.2d 55, 58 (2d Cir.1986); *Hanson v. Luckenbach S.S. Co.*, 65 F.2d 457 (2d Cir.1933). The standard of safety and reasonable fitness is necessarily flexible and must depend on the particular facts of the case. In the Second Circuit, the plaintiff may prove by a preponderance of the evidence: "(1) that a dangerous condition actually existed; (2) that the defendant shipowner had notice of the dangerous condition and should have reasonably anticipated the plaintiff might be injured by it; and (3) that if the shipowner was negligent, such negligence proximately caused the plaintiff's injuries." *Diebold*, 805 F.2d at 58; see also *Rice v. Atlantic Gulf & Pacific Co.*, 484 F.2d 1318, 1320 (2d Cir.1973). In the instant case, Saleh failed to persuade the court that defendant breached any duty owing to him.

Rather, Saleh proved merely that he had been injured, and that his injury was likely exacerbated or caused by something that had occurred aboard the Maine. Saleh's description of his accident, however, was unconvincing: the court has only his account of the condition of the ladderwell where the accident allegedly occurred, and this account is contradictory, confused and belied by other evidence in several places. For example, when initially reporting the accident to Chief Mate Coulombe, Saleh claimed that it had occurred on March 8, 1991. However, he later changed the date to sometime between March 13 and March 17. Tr. at 104–107. Also, he later claimed that he was assisted immediately after the accident by Nagi Ahmed, who, while not a direct witness to the accident, was certainly someone Saleh should have identified to the Chief Mate when he filled out his injury report on April 30, 1991. However, Saleh never called Mr. Ahmed as a witness, nor did Saleh identify him as a witness in the April 30 report to Chief Mate Coulombe.

In addition, Saleh's description of weather conditions at the time of the accident is belied by deck logs for the proposed dates. While Saleh claims that it was raining, and that rain was blown onto the ladderwell through an open hatchway, causing the steps to become slippery, the deck logs show that it was not raining at the time in question. There was evidence that, when it did rain, the hatchway door was closed. Saleh also claimed in his deposition, though not at trial, that the ship was rolling on the date of the accident to "the extent that the things on the table was [sic] moving, to the extent that they were falling." Saleh Deposition at 120. This is also inconsistent with the deck logs for the proposed dates, which indicate that the Maine was riding smoothly at that time.[6]

Saleh testified both at trial and in his deposition that the ladderwell steps were covered in grease and oil at the time of his accident, and that these substances caused him to slip and fall. However, at trial he could not recall ever actually seeing grease and oil on the steps, but remembered seeing it on his hands and on the wall where his foot landed after his fall. Thus the court cannot determine, based on Saleh's testimony alone, that there actually was an unsafe or unreasonably dangerous amount of oil and grease on the steps. Also, Saleh's testimony on the condition of the steps is unsupported by any corroborating evidence. Both Chief Mates during the voyage testified that, while they used the ladderwell on many occasions, they never observed it to be in an unsafe condition. Chief Steward Colon came closest to testifying that the ladderwell steps were unsafe, but his testimony was vague and inconsistent:

Q: Was it [the ladderwell] kept clean and dry?

A: Sometime, it gets—what is that? Funky, you know. Not wet but not too dry either but just between.

. . . . .

---

6. Saleh's trial counsel attempted to rebut this evidence by arguing that the deck logs were only sporadically kept and were therefore unreliable. However, the court finds this assertion merely speculative. Chief Mate Snyder testified that the watch officer responsible for the deck logs in question was accurate and reliable. Snyder Dep. at 67.

Q: Did you see it wet sometimes, the stairs?

A: Well, once in a while.

Q: Not too often or often?

A: Not too often, you know but once in a while, I'd say—it all depends on the traffic that day.

.    .    .    .    .

Q: Well, here's what I'm getting at. If you saw a dangerous condition, would you have somebody do something about it?

A: Right. Clean it.

Q: If you saw it was dangerous?

A: Yes.

.    .    .    .    .

Q: Did you ever see it in a dangerous condition?

A: No.

.    .    .    .    .

Q: Wasn't it usual that people using the stairway might track water if it was raining outside?

A: Yes, sir. That's one of the main things that you go in there. You know when it's raining, people going up and down, it be[sic] wet all day.

Q: And when it gets wet, it can get slippery?

A: Oh, yeah, positively.

Colon Dep. at 53, 82–83.

In the absence of convincing proof of oil, grease, excessive wetness or an unreasonably dangerous condition of any kind on the ladderwell steps, or that defendant was aware of such conditions if they did exist, the court cannot conclude that the defendant breached its duty to provide Saleh with a safe place to work. See *Rice*, 484 F.2d at 1320 (JNOV properly granted on plaintiff's negligence claim where "there was no testimony that an agent of [defendant] had actually seen an accumulation of oil or grease on the ladder prior to Rice's fall, and no circumstantial evidence from which such observation might have been inferred"). While the steps appear worn in recent photographs submitted to the court, Saleh has not argued, correctly the court believes, that the worn condition of the steps alone is enough to render them unfit for use. This is especially true where, as here, Saleh was aware of and typically employed necessary safety precautions when using the steps—namely, the handrails. Colon Dep. at 37; Saleh Dep. at 105.

Since the court finds that no duty owed to Saleh was breached in this case, the court need not consider the other elements of Saleh's Jones Act claim. However, in the interest of completeness, the court notes that even had Saleh demonstrated the steps to be in an unreasonably dangerous or unsafe condition, and even had the defendant been aware of this condition or upon reasonable inspection should have been aware of it, the only evidence linking the condition of the ladderwell steps to Saleh's injury is Saleh's testimony, which is inconsistent, confused and in several places openly contradicted by other evidence. The court believes that, although the burden of proof for causation is slight in Jones Act cases, plaintiff has not met it. See *Wiseman v. Sinclair Refining Co.*, 290 F.2d 818, 820 (2d Cir.1961), *cert. denied* 368 U.S. 837, 82 S.Ct. 63, 7 L.Ed.2d 37 (1961) (judgment for Jones Act plaintiff who sued over unsafe ladder reversed where plaintiff could not recall specifically seeing oil on ladder, but only saw it on his shoe after the fall).

### II. *Unseaworthiness Claim*

■ As one authority has observed, "the Jones Act count and the unseaworthiness count overlap completely: they derive from the same accident and look toward the same recovery." Gilmore & Black at 383. Therefore, much of the court's discussion in the preceding section on Jones Act liability is applicable herein. However, a Jones Act claim and an unseaworthiness claim differ in at least one noteworthy respect: a claim for unseaworthiness under general maritime law, unlike Jones Act liability, does not require a showing of negligence but is rather "a species of liability without fault." *Sojak v. Hudson Waterways Corp.*, 590 F.2d 53, 54 (2d Cir.1978).

■ An unseaworthiness claim is established when plaintiff can show, by a prepon-

derance of evidence, that a shipowner has breached its absolute duty to furnish its employees with a ship and appurtenances that are reasonably fit for their intended purposes. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. at 550, 80 S.Ct. at 933; *Sojak;* 590 F.2d at 54. Under the doctrine of unseaworthiness the shipowner's duty to provide a safe ship is not mitigated by the exercise of reasonable care. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. at 549, 80 S.Ct. at 932–33. However, a shipowner is not under the duty to provide an accident free ship. *Id.* at 540, 80 S.Ct. at 927–28. Rather, "the mere fact that an accident occurs and a seaman is injured while using an appurtenance in the performance of his duties cannot, without more, establish that a vessel is unseaworthy." *Mosley v. CIA. Mar. Adra, S.A.*, 314 F.2d 223, 229 (2d Cir.1963), *cert. denied* 375 U.S. 829, 84 S.Ct. 73, 11 L.Ed.2d 61 (1963).

■ Because there is insufficient evidence to prove that the ship, or any appurtenances thereupon, were not reasonably fit for their intended purposes, the imposition of liability upon defendant would indeed establish the duty to provide an accident free ship. As discussed above, the court has only Saleh's uncorroborated and inconsistent testimony on which to find that oil, grease and water rendered the steps unfit for use or unsafe. Chief Mates Snyder and Coulombe, as well as Chief Steward Colon, all testified that they never observed the steps to be in a dangerous condition.

Although Colon agreed that the steps could be slippery when wet, the deck log unmistakably shows that it was not raining on any of the days suggested by Saleh as the date of the accident. In any event, the Second Circuit has held that "a seaman is not entitled to a deck or ladder that is free of all oil or grease. Unseaworthiness exists only when the oil or grease creates such a condition of slipperiness that the deck or stairway is no longer fit for its intended use by the crew." *Rice v. Atlantic Gulf & Pacific Co.*, 484 F.2d at 1321. The court sees no reason why this result should change when water enters the mix, as long as the ship and its appurtenances remain reasonably fit for use. See *Garrison v. United States*, 121 F.Supp. 617 (N.D.Cal.1954) (temporary presence of water upon deck does not constitute unseaworthiness). Since there is no proof here that the steps were ever slippery enough to render the ladderwell unfit for use, Saleh cannot recover under the doctrine of unseaworthiness.[7]

■ However, even assuming, *arguendo*, the steps were so slippery that an unseaworthy condition existed, Saleh's claim would still be jeopardized by the tenuous evidence of proximate causation between the slippery condition of the steps and his injury. Proof of proximate causation in unseaworthiness claims differs from that under the Jones Act.[8] The Jones Act requires merely any

7. While Saleh argues that the lack of non-skid paint or tape on the ladderwell steps render them unfit for use, the court disagrees. Plaintiff's case is distinguishable from those cited for this proposition. The slippery deck in *Cooper v. Loper*, 1990 A.M.C. 540 (D.N.J.1990) (not otherwise reported) originally had a non-skid surface, unlike the ladder steps in the instant case, which are covered by raised metal beads. *Willener v. Deep Sea Enterprises, Inc.*, 1970 A.M.C. 1238 (D.Ore.1970) (not otherwise reported), is nothing more than a summary order with a skeletal description of the Judge's findings, but even that brief description suggests that the original slippery surface was non-skid, also unlike the instant case.

8. Saleh argues that the standard of causation is equally slight under an unseaworthiness claim as under a Jones Act negligence claim. In support of this proposition, he cites *Milos v. Sea-Land Serv., Inc.*, 478 F.Supp. 1019, 1023 (S.D.N.Y.

1979), *aff'd without op.*, 622 F.2d 574 (2d Cir. 1980), *cert. denied* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 219 (1980), in which the court found standards of proximate causation to be the same under both causes of action. However, this ruling seems to be out of step with other statements of the law on this subject. Jones Act negligence acquired its minimal standard of proximate causation by implication from FELA, 46 U.S.C. § 51, which holds employers liable for injuries to their employers caused "in whole or in part" by their negligence. *Supra* at n. 5; *Farnarjian v. American Export Isbrandtsen Lines, Inc.*, 474 F.2d 361, 364 (2d Cir.1973). The unseaworthiness cause of action, by contrast, exists separately and concurrently with Jones Act negligence liability. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499, 91 S.Ct. 514, 517–18, 27 L.Ed.2d 562 (1971); Gilmore & Black at 383. Moreover, the case relied upon by the *Milos* court to reach its result, *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 331 (5th Cir.1977), is of uncertain prece-

proof of causation, even the slightest, between the breach of duty and the resulting injury. *Ferguson v. Moore–McCormack Lines, Inc.*, 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957); *Johannessen v. Gulf Trading & Transportation Co.*, 633 F.2d 653, 656 (2d Cir.1980). However, in an unseaworthiness claim under general maritime law proximate cause means: 1) that the unseaworthiness played a substantial part in bringing about or actually causing the injury; and 2) that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. *Smith v. Transworld Drilling Co.*, 772 F.2d 157, 162 (5th Cir.1985); 1B *Benedict on Admiralty*, 3–182, 3–184 (7th ed. 1993).

In the instant case, Saleh failed to provide any probative evidence, other than his own inconsistent testimony, linking the condition of the ladderwell steps to his disc herniation and back injuries. While one of his treating physicians, Dr. Enrique Ergas, testified that Saleh's fall down the ladder steps was a "competent producing cause" of his disc herniation and was the cause of his back injury within a "reasonable degree of medical certainty," the court does not conclude that by this testimony Saleh established the necessary link between his current injury and an unseaworthy condition on the Maine. Even though it is medically possible, or even probable, that the accident described by Saleh gave rise to the injuries he now suffers, the burden remains on Saleh to persuade the fact-finder that the accident actually happened as claimed and that it arose from an unseaworthy condition. This he has not done.

## CONCLUSION

For all the above reasons, the court dismisses Saleh's claims and orders that judgment be entered for defendant in accordance with this opinion.

So ordered.

dential authority in its own circuit. See *Smith v. Trans-world Drilling Co.*, 772 F.2d 157, 162 (5th Cir.1985) (distinguishing proximate cause under

Jones Act and unseaworthiness theories of liability); *Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 686 (10th Cir.1981).