**Fadel NASSER, Plaintiff,**

v.

**CSX LINES, LLC, Defendant.**

No. 00–CV–2043 (JMA).

United States District Court, E.D. New York.

March 20, 2002.

Sheldon Tabak, Esq., Robert Gunther, Esq., Tabak & Mellussi, New York, for Plaintiff.

Joseph Stearns, Esq., Noreen D. Arralde, Esq., Kenny & Stearns, New York, for Defendant.

### Decision and Order

AZRACK, United States Magistrate Judge.

Pursuant to the parties' consent, 28 U.S.C. § 636(c) (2000), the Court conducted a bench trial in this matter to resolve issues and liability presented under both the Jones Act, 46 U.S.C.App. § 688, *et seq.* (2000) and general maritime law. The Court has reviewed the parties' submissions, the evidentiary exhibits and assessed the credibility of all witnesses. The Court now sets forth its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### I. FINDINGS OF FACT

Fadel Nasser ("Nasser"), a Yemeni native, arrived in the United States in 1976 when he was twenty-five years old. While in the United States, Nasser held various jobs, such as working in grocery shops, earning cash wages. During the course of his stay in the United States he has made many extended trips to and from his native homeland. When spending extended periods in Yemen, Nasser, according to his own testimony, did not work, earn or receive any income. As an obvious result of his trips to and from his homeland, there are large gaps in his employment history.[1]

At all times relevant to this case, Nasser was a member of the Seafarers International Union ("SIU"). The SIU is a labor union whose members seek placement as

---

1. Nasser's work history is tangentially relevant to his credibility and the Court attempts to succinctly describe it. Upon arriving in the United States at age twenty-five he began working as a baker in California where his father was also working. Nasser worked in the bakery for about one year. His father supported him during that time and provided him with funds to eventually open up a grocery store in Brooklyn, New York in 1978. Nasser operated the grocery for three years and eventually sold it in 1981. Nasser subsequently began working for cash in various grocery stores throughout New York City.

In 1983, Nasser returned to Yemen to get married and stayed there for approximately one year without working or earning any money. After returning in 1984 and continuing until 1988, Nasser continued working for cash in various grocery stores and did not report any income. In 1988, Nasser returned to Yemen and remained there for about a year and did not work or earn any money there. Upon returning to the United States, Nasser inquired as to the seaman profession upon a recommendation from a friend. Nasser filled out the union paper work and took the required physical examination. He did not work or report any income during 1989, while he was waiting to become a seaman. Nasser eventually became a member of the seaman's union.

Nasser first shipped out in October of 1990. After brief tours of duty on two different ships Nasser returned to Yemen where he did not work or earn income and returned to the United States in 1995. Upon his return in 1995 Nasser began seeking ship duty but found the task of securing rewarding jobs difficult given both his low seniority designation and the three year gap in employment. As a result, Nasser generally secured lower paying positions on ships that did not spend a significant amount of time at sea. Nasser did not work or earn any income from September of 1997 until July 3, 1999, the latter date being his initiation of service aboard the OOCL INNOVATION.

seamen aboard American flagged ships. Union members secure employment aboard vessels by amassing in the "hiring hall" when a "job is put 'on the board' for bids." *Defendant's Proposed Findings of Fact and Conclusions of Law,* at 3. Seamen with "A book" ratings are given priority in selecting from available jobs. As a result, lower rated seamen are relegated to less palatable positions. At the time of his injury, Nasser held the lowest seniority designation. Nasser was classified as "B book" and hence only eligible for entry level ratings, such as the Deck Engine Utility ("DEU") position. On July 3, 1998 Nasser, given the holiday weekend, successfully bid for a position aboard the OOCL INNOVATION, which was making its way toward various European ports. The Innovation is a container ship that principally ships cargo from various ports along the eastern United States to northern Europe.

As it concerns the events of Nasser's accident, the Court substantially credits the deposition testimony of Second Mate Roger Bumstead ("Bumstead"). The incident giving rise to the instant suit occurred on December 31, 1998. On that day, the ship was preparing to depart the port at Bremerhaven, Germany and make its way to Felixstowe, England. At approximately 12:15 p.m. Nasser was working with the stern mooring gang, which was under Bumstead's direction. AB Miguel and AB Crespo were also members of the mooring gang and were operating the winches. Bumstead typically communicates with members of his gang by using hand signals as the noise level is quite high on the stern of the ship.

Nasser was standing to the left of Bumstead and awaiting orders while the German line handlers were working ashore. At one point during the unmooring operation AB Crespo's line became tangled as it did not come off the drum correctly. This was a common occurrence, especially in the rough winter seas of northern Europe. The problem is easily remedied by either pulling or kicking the line in order to free it up. As such, Bumstead ordered Crespo to stop the winch. Nasser instinctively went over to free the line as he was closest to it and cleared it by kicking it. Noticing that the line was clear and without order or direction from Bumstead, Crespo took it upon himself to heave the line. As a result, Nasser was thrown from his feet about two feet into the air. Nasser landed on his buttocks and his arm struck the bit as he reached out in an attempt to break his fall.[2] Immediately after the accident, Nasser gathered his wits about him and continued working his shift, which included returning to his DEU duties after departure from Bremerhaven.[3]

Bumstead also serves as a medical officer and two hours later Nasser reported to him on the bridge and complained of back pain. Nasser was given aspirin, ointment, a heating pad and band aids. *See Defendant's Exhibit A.* Bumstead instructed the Chief Engineer that Nasser should not continue working and to send him to a doctor when the ship arrived in the ship's next port.

---

**2.** The testimony surrounding the exact circumstances of how Nasser was thrown into the air are in dispute. According to Bumstead, Nasser took a few steps from the line after clearing it and was struck in the back of the calf after Crespo heaved it. The medical reports, however, tell a different story. According to the medical history taken by Dr. Berlin, Nasser informed him that his foot was on the line when it was heaved. At trial, Nasser denied this. The Court finds that Nasser's foot was clear of the line at the time it was heaved.

**3.** The mooring gang duties included policing the deck, picking up heavy lines and stoppers and shutting the pumps off.

Upon arriving in Felixstowe, the ship made arrangements for Nasser to be seen by a local doctor on January 1, 1999. Because the facility in Felixstowe was closed, the ship sent Nasser to Ipswich Hospital, which is located one town over. There, he was examined and given pain medication. From the medical records it appears that diagnostic imaging testing occurred and that the results were normal. *See Plaintiff's Exhibit 9.* After the examination Nasser returned to the ship, but because the doctors at Ipswich failed to note whether he was fit or unfit for duty the ship had to send him to an additional doctor. Nasser was next sent by taxi to a local clinic in Rotterdam, which was the ship's next port of call. A final prognosis of "not fit for duty" was rendered and Nasser was repatriated to the United States by plane at the ship's expense.[4]

Nasser returned to the United States on January 3, 1999. During the month of January he consulted with his attorney, Sheldon Tabak, Esq, and on February 1, 1999 he signed a retainer agreement with him. On February 2, 1999, about one full month after being repatriated, Nasser went down to the union hall and requested to see the SIU physician, Dr. Arnold Berlin. Nasser explained that the delay in seeking treatment was due to the fact that he was observing the holy period of Ramadan. The testimony on this point is particularly instructive of Nasser's credibility. Nasser testified that he was an observing Muslim. When asked to detail his attempts to seek treatment Nasser testified as follows: "You see when Ramadan is ended I went *right away* to see the union doctor . . ." (emphasis supplied). Defense counsel, however, has established to my satisfaction that Ramadan began on Sunday, December 20, 1998 and approximately

ended on Wednesday, January 20, 1999. *See Defendant's Exhibit K.* This coincides with the date that Nasser was aboard the ship whose journey was going to outlast the Ramadan observance and there is no evidence at all that establishes Nasser was observing Ramadan aboard the ship. These facts completely controvert Nasser's testimony at trial. Accordingly, I conclude that Nasser was not credible about his delay in seeking treatment and I draw an inference that his complaints of pain are exaggerated.

Dr. Berlin examined Nasser on February 2, 1999 and recorded his history. Dr. Berlin then referred Nasser to Dr. Perry J. Stein for further evaluation. Nasser was examined by Dr. Stein on February 3, 1999, forty-one days after the accident. According to Dr. Stein, Nasser complained of severe lower left back pain and recommended further diagnostic testing, including an MRI, and physical therapy sessions. His physical exam specifically ruled out a lumbar radiculopathy. *See Plaintiff's Exhibit 13.* The MRI indicated only "mild degenerative disc changes at L3–4 and L4–5 without significant bulge or herniation" and ruled out any "bone lesion or subluxation." *See Plaintiff's Exhibit 15.*

On March 29, 1999 Nasser was once again examined by Dr. Stein. Nasser complained of ever increasing pain and sexual dysfunction. At trial, Nasser denied registering the latter complaint. In any event, Dr. Stein concluded that the MRI of Nasser's "lumbosacaral spine and pelvis failed to reveal any significant injury." *Plaintiff's Exhibit 13.* Dr. Stein diagnosed Nasser as suffering from post-traumatic stress disorder and recommended that he undertake psychiatric treatment along side a physical therapy

---

4. Specifically, Dr. G.L.J. Slee diagnosed Nasser with a sever contusion to the lower back. Dr. Slee recommended that Nasser take two weeks off from work. *See Plaintiff's Exhibit 4.*

regime. Nasser failed to pursue psychiatric treatment.

Nasser returned to Dr. Berlin on April 6, 1999. Upon examination, Dr. Stein concluded that Nasser was fit for duty and that any alleged symptoms were not associated with any disease. Nasser then made his way to Dr. Harold S. Goldberg, D.O. on May 27, 1999 and continued to be treated by him until May 24, 2000. Seven months into treatment with the Chelsea Village Medical Office, Dr. Goldberg concluded that Nasser's subjective complaints were inconsistent with his objective findings. In a letter to Nasser's counsel Dr. Goldberg asked that he prepare an authorization for a psychological evaluation. *Defendant's Exhibit H.* Nasser, again, failed to pursue this avenue of treatment and presented no evidence that establishes he ever sought authorization for such treatment.

In May 2001 Nasser was also treated by Dr. Andrew Davy, an anesthesiologist and pain management specialist. Dr. Davy conducted a neuro-electrodiagnostic study and concluded that a unilateral L4–S1 lesion and/or arthritis of the joint were the possible causes of Nasser's pain and treated him with regular injections that were of no long term help. Dr. Davy's treatment ceased in November 2001 as the defendant refused to continue to pay his bills. Defendant correctly notes that Dr. Davy's bills were never proffered or received into evidence.

In late January 2001 Nasser sought treatment for his back condition with Dr. Mohamed Monsour, a gastroenterologist by training. Dr. Monsour referred Nasser to Dr. Hyung L. Yhu who conducted a nerve conduction study and found a mild radiculopathy at the L5–S1 level. A second nerve conduction study performed by Dr. S. Raguthu of the Interfaith Medical Center and an orthopedic evaluation by Dr. Madakini Patel of HS Systems, Inc.

reached almost similar conclusions. Dr. Monsour also arranged for Nasser to take a second MRI on September 14, 2001. The second MRI, in stark contradistinction to the nerve conduction studies, revealed that no significant change had taken place when compared with the results of the first MRI performed two years earlier. To the extent that any changes in the spine took place, they occurred at the L3 and L4 levels and not the L5 level. In spite of the above, Dr. Monsour diagnosed Nasser with stenosis. Dr. Monsour's findings are seriously discounted.

Dr. Gerald H. Klingon, plaintiff's medical expert and a neurologist by practice, examined Nasser on January 27, 2000 and again on October 30, 2001. Dr. Klingon, who did not treat Nasser, disagrees with the readings of both MRIs and claims that Nasser is plagued with a radiculopathy at the L4 level. Dr. Klingon also diagnosed Nasser's condition as permanent.

Dr. Douglas Cohen, the defendant's medical expert and a neurosurgeon by practice, briefly examined Nasser on January 10, 2001 and reviewed substantially all of his medical records. Nasser informed Dr. Cohen that he experienced pain in his lower back that radiated bilaterally into both legs in a circumferential fashion from the hips to the toes. Nasser also complained that he was unable to maintain an erection.

At trial Dr. Cohen explained that the nerve roots of the spine generally correspond to a particular area and side of the legs. According to Dr. Cohen, there exists no neuroanatomical explanation for Nasser's claim that he is experiencing pain in both sides of his legs circumferentially. Dr. Cohen rules out the fact that Nasser is suffering from a radiculopathy for four principal reasons: (i) the MRI dated Feb. 5, 1999 presents no significant pathology of the discs; (ii) there is no nerve root com-

pression; (iii) during the examination Nasser had no problem with straight leg raises; and (iv) Nasser's legs fail to evince a loss of muscle tone or any evidence of muscle atrophy. Moreover, Nasser's alleged lack of sensation to soft touch in the legs is not consistent with radiculopathy because it does not follow a known dermatol pattern and it is bilateral, which is inconsistent with a radiculopathic or herniated disc. Even assuming that Nasser was suffering from a radiculopathy, Dr. Cohen opines that it would have to be present at the L5 level in order to cause the symptoms complained of.

Dr. Cohen concurs with the diagnoses of Drs. Berlin, Stein, Goldberg and the Ipswich Hospital records all of which conclude that Nasser did not sustain a significant neurologic deficit. The Court substantially credits Dr. Cohen's testimony.

As is evident, this case carries with it a history of medical treatment that is long, tortured, duplicative, contradictory and not necessarily dispositive of much. After carefully reviewing all of the testimony and evidence the Court finds that Nasser does not suffer from a radiculopathy at any level in his spine nor does Nasser suffer from stenosis or any other nerve disease. This is not to say that Nasser is not experiencing pain as a result of his injuries. The Court only finds that Nasser's claims of pain are exaggerated. Upon review of the evidence, the testimony, and Dr. Cohen's testimony in particular, the Court is of the opinion that Nasser suffers from a severe contusion of the lower back and post-trauma disorder. This finding is consistent with the findings of Ipswich Hospital, the diagnoses of Drs.

Slee, Berlin, Stein and Goldberg, and most importantly both MRIs.[5]

## II. CONCLUSIONS OF LAW

With its fact finding accomplished, the Court endeavors to apply those facts to the applicable principles of law. The Court finds defendant liable to Nasser in negligence. The Court also dismisses the unseaworthiness cause of action as Nasser has failed to prove that the rope that struck him was not reasonably fit for its intended purpose or that its condition caused his injuries. Rather, his injury was caused by the negligence of a fellow servant. Lastly, the Court declares that under the maximum medical recovery date Nasser is not entitled to any maintenance and that defendant must provide cure that it withheld for the period of December 31, 1998 to November 21, 1999.

### A. *The Jones Act*

According to the Jones Act, a "seaman who shall suffer personal injury in the course of his employment may ... maintain an action for damages at law ..." 46 U.S.C.App. § 688(a) (2000). As the statute makes clear, the Jones Act creates a federal negligence action for injured seamen. *Norfolk Shipbuilding & Drydock Corp. v. Garris,* 532 U.S. 811, 121 S.Ct. 1927, 1932, 150 L.Ed.2d 34 (2001); *Chandris Inc. v. Latsis,* 515 U.S. 347, 355, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995), and its animating concern is that seamen be provided a reasonably safe place to work.

To prevail under the Jones Act, plaintiff, by a preponderance of the evidence, must establish three elements.

---

5. According to the testimony, Nasser, on several occasions imparted to physicians that examined or treated him that he was suffering from sexual dysfunction or slight incontenance. At trial, Nasser denied that this was the case and did not press the issues. The

Court fully recognizes that these issues are embarrassing to admit to strangers in open court as opposed to a doctor in a private examining room. The Court, however, cannot make Nasser's case for him and is constrained to completely disregard such claims.

First, plaintiff must establish that he was an employee of the defendant and acting as such within the scope of his employment during the time of the accident. 46 U.S.C.App. § 688(a). This element is undisputed. Moreover, plaintiff must establish that the defendant's actions were negligent. Negligence is the failure to employ reasonable care given the circumstances. The vessel owner owes his seamen "an 'obligation of fostering protection,'" which typically translates into "a higher duty of care" than that accorded to "land based torts." *Saleh v. United States*, 849 F.Supp. 886, 891 (S.D.N.Y.1994) (quoting *Cortes v. Baltimore Insular Line, Inc.*, 287 U.S. 367, 374, 53 S.Ct. 173, 77 L.Ed. 368 (1932)). Lastly, plaintiff must establish that the defendant's negligence caused his injuries. The Jones Act carries with it a substantially relaxed quantum of proof required to establish causation. That is, plaintiff need only demonstrate that defendant's "negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Ferguson v. Moore–McCormack Lines*, 352 U.S. 521, 523, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957) (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)); *see also Diebold v. Moore McCormack Bulk Transport Lines, Inc.*, 805 F.2d 55, 57–58 (2d Cir. 1986).

The Jones Act does not recognize the doctrines of assumption of the risk or contributory negligence as defenses to liability; only comparative negligence principles are recognized. *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408–09, 74 S.Ct. 202, 98 L.Ed. 143 (1953); *Socony–Vacuum Oil Co. v. Smith*, 305 U.S. 424, 428–33, 59 S.Ct. 262, 83 L.Ed. 265 (1939); *Max Morris*, 137 U.S. 1, 14–15, 11 S.Ct. 29, 34 L.Ed. 586 (1890). Should the shipowner successfully raise this affirmative defense, the Court must then accordingly apportion fault.

The Court finds that all of the elements of negligence under the Jones Act have been established. The Innovation had a duty to provide Nasser with a reasonably safe place to work. The vessel vicariously breached that duty when AB Crespo negligently heaved the line without instruction or command or independent investigation as to the safety of such a course of action. The vessel's negligence, moreover, was the proximate cause of Nasser's injury. Nasser was in no way contributorily negligent. Therefore, the Court awards Nasser judgment in the amount of $10,000 without pre-judgment interest. *Jones v. Spentonbush–Red Star Co.*, 155 F.3d 587, 593 (2d Cir.1998); *Magee v. United States Lines*, 976 F.2d 821, 822 (2d Cir.1992).

### B. *General Maritime Law*

Nasser also brings claims against CSX Lines based on the federal maritime common law doctrine of unseaworthiness. Under this doctrine a vessel owner is charged with the duty to provide its seamen "with a ship and appurtenances that are reasonably fit for their intended purposes." *Sojak v. Hudson Waterways Corp.*, 590 F.2d 53, 54 (2d Cir.1978) (per curiam) (citations omitted); *see also Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441, 121 S.Ct. 993, 148 L.Ed.2d 931 (2001); *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 99, 64 S.Ct. 455, 88 L.Ed. 561 (1944). According to the Supreme Court, a vessel owner

> is [not] obligated to furnish an accident free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service.

*Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960) (citing *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354, *as amended*, 350 U.S. 811, 76 S.Ct. 38, 100 L.Ed. 727 (1955)). Once established, unseaworthiness results in the vessel owner's strict liability. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 94–95, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); *Sojak*, 590 F.2d at 54 (citing *Conty v. States Marine Lines, Inc.*, 355 F.2d 26, 28 (2d Cir.1966)).

Causation is established when it is shown that the "unseaworthiness played a substantial part in bringing about or actually causing the injury and the injury was either a direct result or reasonably probable consequence of unseaworthiness." *Saleh*, 849 F.Supp. at 895 (citations omitted). While negligence is irrelevant with respect to establishing unseaworthiness, *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 328, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960), comparative negligence principles are nonetheless applicable. *Pope & Talbot*, 346 U.S. at 408–09, 74 S.Ct. 202. "Liability based on the concept of unseaworthiness is 'wholly distinct' from the liability based on negligence because unseaworthiness derives from a condition of the vessel-not limited by conceptions of negligence-and precisely how the condition came into being is irrelevant to the owner's liability for injuries resulting from it." *In re Hygrade Operators, Inc.*, 2001 WL 225028 *4 (S.D.N.Y. Mar.6, 2001) (citing *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971) and *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549–50, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960)).

Nasser has failed to prove the required elements of this claim. Specifically, Nasser does not point to, and none of the proffered testimony establishes that, any specific ship appurtenance was unseawor-thy. *See In re Hygrade Operators, Inc.*, 2001 WL 225028 *4 (S.D.N.Y. Mar.6, 2001).

In dismissing Nasser's unseaworthiness claim the Court relies on *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971), wherein the Supreme Court endeavored to make clear the difference between negligence and unseaworthiness. In *Usner* a fellow employee lowered a properly maintained and operating sling "too far and too fast," causing it to injure the petitioner. *Id.* at 495, 91 S.Ct. 514. In rejecting an attempt to fasten the vessel owner with unseaworthiness liability, the Court—in pointing out the obvious—instructed that unseaworthiness concerns itself with the "condition" of the ship or its equipment and that the manner in which that condition is brought about is irrelevant. *Id.* at 498, 91 S.Ct. 514. Focusing on how the injury was occasioned the Court discounted "the isolated, personal negligent act of the petitioner's fellow longshoreman," reasoning that any contrary analysis would "subvert the fundamental distinction between unseaworthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions." *Id.* at 500, 91 S.Ct. 514.

Nasser's unseaworthiness claim is virtually identical to the one advanced in *Usner*. In this case, it was the negligence of AB Crespo that caused Nasser's injuries. It was Crespo that heaved the line causing Nasser to be thrown into the air. Even assuming otherwise, Nasser points to no facts that the line or any other appurtenance was in an unseaworthy condition. Nor does Nasser allege that the mooring crew was incapable or inadequate or so poorly staffed so as to be unable to safely perform their duties. Hence, Nasser has failed to establish that the line played a substantial and direct part in occasioning

his injury. Accordingly, the unseaworthiness claim is dismissed.

### C. *Maintenance and Cure*

Maintenance and cure are implied and non-amendable contractual rights whose recognition traces back to the law codes of the middle ages. *See generally Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938); *Cortes v. Baltimore Insular Line, Inc.,* 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368 (1932) (Cardozo, J.); *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); *Gillikin v. United States,* 764 F.Supp. 261 (E.D.N.Y.1991); Martin J. Norris, 2 The Law of Seamen §§ 26:1–26:4, at 4–11 (4th ed.1985); *see also Moran Towing & Trans. v. Lombas,* 58 F.3d 24, 26 (2d Cir. 1995) (discussing the quasi contractual nature of maintenance and cure). These implied rights arise from the recognition of the fact that the seaman's work is "an arduous and perilous service." *Taylor,* 303 U.S. at 528, 58 S.Ct. 651. Since seamen are viewed as "wards" of the "admiralty courts," the Supreme Court instructs that in determining maintenance and cure issues all "ambiguities or doubts ... are resolved in favor of the seaman." *Vaughan v. Atkinson,* 369 U.S. 527, 532, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) (citations omitted); *see also Gillikin,* 764 F.Supp. at 267 (stressing the role of the court as "a seaman's guardian").

"Maintenance consists of the monetary sum sufficient to provide food and lodging to the seaman during his or her convalescence until such time as the seaman reaches maximum medical recovery," or his condition permanently stabilizes or becomes incurable. *Brown v. OMI Corp.,* 1994 WL 39026 *4 (S.D.N.Y. Feb.9, 1994) (citations omitted); *see also Lewis,* 531 U.S. at 441, 121 S.Ct. 993; *Mooney v. City of New York,* 219 F.3d 123, 127 n. 1 (2d Cir.2000), *cert. denied,* 531 U.S. 1145,

121 S.Ct. 1083, 148 L.Ed.2d 958 (2001); *Marcinowski v. McCormack Boys Corp.,* 160 F.Supp.2d 708, 717 (S.D.N.Y.2001). An injured seaman is entitled to maintenance irrespective of a vessel owner's negligence, *Vella v. Ford Motor Co.,* 421 U.S. 1, 4, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975), and the duty to provide it is nearly absolute. *Farrell v. United States,* 336 U.S. 511, 516, 69 S.Ct. 707, 93 L.Ed. 850 (1949).

"The ancient right to cure in maritime law represents a shipowner's obligation to provide medical care to seamen who fall ill or become injured while they are in service to a vessel." *Calo v. Ocean Ships, Inc.,* 57 F.3d 159, 162 (2d Cir.1995). The obligation to provide cure ceases when maximum medical recovery is achieved, *Vaughan,* 369 U.S. at 531, 82 S.Ct. 997, or when a doctor diagnoses the particular injury as a permanent one. *Vella,* 421 U.S. at 5, 95 S.Ct. 1381; *see also Fitzgerald v. United States Lines Co.,* 374 U.S. 16, 20 n. 7, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963) (citing *Farrell v. United States,* 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949)) ("Medical expenses need not be provided beyond the point at which a seaman becomes incurable."). Maintenance and cure are in no way compensatory in nature. These rights primarily serve to encourage employment in the profession so as to foster domestic and international commerce. Stated otherwise, maintenance and cure exist as supplemental remedies alongside negligence and unseaworthiness. *See generally* Norris, The Law of Seamen, § 26:13, at 29–30.

Nasser was paid maintenance of $8 per day as per the SIU contract. The parties have stipulated to the fact that defendant's last maintenance payment was made on November 21, 1999. I find that this date constitutes the maximum medical recovery date. This date corresponds with the treatment of Dr. Goldberg. The Court

chooses this date by giving Nasser the benefit of the doubt. *See Vaughan,* 369 U.S. at 532, 82 S.Ct. 997; *Gillikin,* 764 F.Supp. at 262. Drs. Berlin and Stein concluded that maximum medical recovery had been achieved much earlier then the termination of maintenance payments. Drs. Berlin and Stein, however, were, at bottom, agents of the defendant. On the other hand, Dr. Goldberg was independently chosen by Nasser and arrived at the identical prognosis and that is the prognosis that the Court partially adopts. Accordingly, no further maintenance payments are required of defendant.[6]

The maximum medical recovery date applies to the issue of cure as well. According to the evidence, defendant terminated cure payments during the course of Nasser's treatment with Dr. Goldberg. Thus, Nasser is entitled to all reasonable medical curative (i.e. not palliative) expenses incurred, *McMillan,* 885 F.Supp. at 461, due and owing as of November 21, 1999.[7] The evidence at trial only establishes that Dr. Goldberg's total bills amounted to $9,677.13. The Court is unable to determine the proper amount due and owing as of November 21, 1999. Nor is the Court able to ascertain what portion of that amount, if any, can be properly attributed to curative treatment. Accordingly, the parties are directed to either enter into a stipulation or submit documentation to the Court substantiating such.

## III. CONCLUSION

For the reasons set forth above, the Court finds CSX Lines liable in negligence. The Clerk of the Court shall enter a final judgment in favor of Fadel Nasser against CSX Lines in the sum $10,000 in addition to the amount of cure due and owing to be determined and shall close this case.

SO ORDERED.

---

6. The issue of maintenance as provided for in collective bargaining agreements has caused some consternation among the lower courts as they typically provide for insignificant daily payments as is the case here. It is simply not possible to procure food and lodging on $8 per day. This reality stands in contrast to the fact that maintenance payments are intended compensate for the food and lodging that a seaman would enjoy at no cost while aboard his vessel. While the Second Circuit has not necessarily answered the precise question of whether and when a seaman may seek maintenance above and beyond the contract rate, *see Incandela v. American Dredging Co.,* 659 F.2d 11, 14 (2d Cir.1981) (rejecting the adoption of a "frozen dollar figure" approach to maintenance), the lower courts of this Circuit have answered that question affirmatively. *See, e.g., Durfor v. K–Sea Transp. Corp.,* 2001 WL 856612, No. 00–CV–6728 (S.D.N.Y. July 30, 2001); *Gillikin,* 764 F.Supp. 261 (E.D.N.Y.1991); *see also McMillan v. Tug Jane A. Bouchard,* 885 F.Supp. 452 (E.D.N.Y. 1995) (Trager, J.) (expansively interpreting *Incandela*). Nevertheless, the Court emphasizes that Nasser makes no claim for maintenance greater than the contract rate and has failed to provide an evidentiary basis that he is entitled to it.

7. The Court also emphasizes that while Nasser alleges that the defendant "turned a deaf ear" to his cure requests, *Plaintiff's Proposed Findings of Fact and Conclusions of Law,* at 30, he does not seek to recoup attorney fees for any alleged "callous" or "recalcitrant" failure to remit maintenance or cure. *See, e.g., Incandela,* 659 F.2d at 15; *McMillan,* 885 F.Supp. at 466.